[PHILADELPHIA, DECEMBER 29, 1828.]

## BIDDLE'S Executors *against* ASH.

### IN ERROR.

A. and B., in contemplation of marriage, executed a deed, by which a large real estate, being the wife's share and proportion of her late father's real estate, was conveyed to trustees upon certain trusts for her benefit, and in reference to a considerable personal property, "being her share of the personal estate of her late father;" the husband covenanted, that all the purchases of real estate he might make, with the above mentioned personal property of the wife, which should come to his hands during the intended marriage, should be vested in the wife, subject to certain powers in the husband, and that if, at the time of her decease, he should be in possession of any of the personal property of the wife, received from the estate of her late father, not contracted to be laid out in real estate, he would account to the trustees for the principal thereof: it being understood that he should not be accountable for the interest or rent of any such monies or estates as might come into his hands during their joint lives.

On the day before the execution of the settlement, a part of the real estate was sold; part of the purchase money was paid, and bonds given by the purchaser for the residue, which were paid off after the marriage, but no alteration was made in the deed in consequence of the sale.

The husband, after the marriage, received considerable sums of money from the executors of the wife's father, part of which consisted of interest which had become due to that estate after the date of the marriage settlement.

Part of the wife's personal estate was laid out by the husband in the purchase of vacant lots, which were conveyed as directed by the settlement, and he expended considerable sums of money in filling up those lots, and curbing and paving in front of them.

After the wife's death, the executors of the surviving trustee brought an action of covenant upon the settlement, against the husband, and it was *held,*

That the proceeds of the real estate sold before the execution of the settlement, did not pass to the trustees, in the place of the land itself.

That the husband was not bound by his covenant, to account to the trustees for the proceeds of the sale.

That he was not bound to account for monies received from the executors of the wife's father, in the shape of interest which had accrued subsequently to the date of the settlement; and that he was entitled to credit for the expense of filling up vacant lots purchased in pursuance of the settlement, and for curbing and paving in front of them.

THIS was an action of covenant brought in this court upon a sealed instrument, in these words:

"This indenture *Tripartite* made the fifteenth day of *March,* in the year of our Lord one thousand eight hundred and four, between *James Ash,* of the city of *Philadelphia,* Esquire, of the first part, *Rachel Douglas,* of the said city, widow, of the second part, and *Charles Biddle* of the said city, Esquire, and *Charles French* of the same place, merchant, of the third part. Whereas the said *Rachel Douglas* is seised to her and her heirs for ever, of the following real estate in the city of *Philadelphia,* to wit:"—[Then followed a description of a large amount of real estate, consisting principally of unimproved lots, in and near the city. Among other estates described, was *an undivided third part of a three*

(Biddle's Executors *v.* Ash.)

*story brick messuage, kitchen, sugar house, stores, buildings, and improvements, on a lot of ground situate on the north side of Vine street, between Second and Third streets, containing in front one hundred and seventeen feet, four inches.*] Being the share and proportion of the said *Rachel Douglass*, in the real estate of her late father, *Jacob Morgan*, assigned and allotted to her under two writs of partition, to divide the said *Jacob Morgan's* estate, lately executed in the Supreme Court of *Pennsylvania*, as, by the records of the said court, in that case, will more fully appear. And, whereas, the said *Rachel Douglass* is also possessed of, or entitled to a considerable sum of money, goods and chattels, being her share of the personal estate of her late father, the exact amount and quantity of which cannot, at present, be ascertained; and, whereas, a marriage is intended to be shortly had and solemnized, between the said *James Ash* and *Rachel Douglass*, and it is the desire and intention, of both parties, to secure the said real and personal estate of the said *Rachel Douglass*, in the manner hereinafter mentioned: Now, this indenture witnesseth, that the said *James Ash* and *Rachel Douglass*, in consideration of the premises, and of the sum of one dollar, to them, in hand paid, by the said *Charles Biddle* and *Charles French*, the receipt whereof is hereby acknowledged, have granted, bargained, and sold, aliened, enfeoffed, released, and confirmed, and, by these presents, do grant, bargain, and sell, aliene, enfeoff, release and confirm, unto the said *Charles Biddle* and *Charles French*, their heirs and assigns, all and singular, the hereinbefore mentioned and described messuages, lots, tenements, yearly rent charges, hereditaments, and premises, situated, bounded, and being as hereinbefore mentioned, together with the rights, privileges, members and appurtenances, whatsoever thereunto belonging and appertaining, to have and to hold the same to the said *Charles Biddle* and *Charles French*, their heirs and assigns, to the proper use and behoof of the said *Charles Biddle* and *Charles French*, their heirs and assigns for ever. In trust, however, and to the use, intent, and purpose following, that is to say: to the use of the said *Rachel Douglass*, her heirs and assigns, until the said intended marriage shall take effect; and from and after the solemnization of the said marriage, then they, the said *Charles Biddle* and *Charles French*, and their heirs, shall be and stand seised of the premises, to the intent, uses, and purposes following, that is to say: to permit and suffer the said *James Ash* and *Rachel Douglass*, to take the rents, issues, and profits of all and singular, the premises, for and during their joint lives, to their proper use without impeachment of waste; and, from and after the decease of the said *Rachel Douglass*, in case the said *James Ash* shall survive her, then, to the use of such person or persons, and for such estates and interests in the premises, and every or any part thereof, as the said *Rachel Douglass* may and shall, by her last will and testament, or any instrument in writing, by her signed, and attested by two credible wit-

(Biddle's Executors *v.* Ash.)

nesses, in the nature of a last will and testament, or a testamentary appointment, notwithstanding her coverture, direct order, limit or appoint. Provided, that no estate or interest in the said premises, or any part thereof, may or shall be limited, devised, or appointed to the use of the said *James Ash,* for any longer time than during his natural life, 'except in case of the death of the children, which she now has and may hereafter have,' such being the said *James Ash's* own express desire; and for want of such testamentary appointment, to be made in manner aforesaid by the said *Rachel Douglass,* she dying before the said *James Ash,* and also, in case she, the said *Rachel Douglass,* shall survive the said *James Ash,* then to the use of the said *Rachel Douglass,* her heirs and assigns, in fee simple. And the said *James Ash,* for and in consideration of the premises, doth hereby covenant, grant, promise, and agree to and with the said *Charles Biddle* and *Charles French,* that all and every purchase of real estate, which he may and shall make with the above-mentioned personal property of the said *Rachel Douglass,* which shall come to his hands during the said marriage intended to be solemnized, shall be conveyed to and vested in the said *Rachel Douglass,* her heirs and assigns. And it is further covenanted, agreed, and declared to be the true intent and meaning of these presents, that the said *James Ash* and *Rachel Douglass,* shall and may have power, during the said coverture of the said *Rachel Douglass,* to grant, bargain, and sell, by way of barter or exchange for other real estate, producing an income, all or any of the unimproved lots of ground belonging to the said *Rachel Douglass,* or which hereafter may belong to her, or to let out any of the said lots on ground rent. Provided the said real estate, so to be acquired by way of exchange, and all and every the ground rents which may be reserved upon any such lots of ground shall be conveyed or reserved to and vested in the said *Rachel Douglass,* her heirs and assigns, and all such real estates so to be acquired by way of exchange, and all such ground rents, to be reserved, shall be subject to the same uses and trusts, in all respects, as are hereinbefore declared and appointed. And the said *James Ash* doth, by these presents, further covenant and agree to and with the said *Charles Biddle* and *Charles French,* their heirs and assigns, in manner following, that is to say: that *if, at the time of the decease of the said Rachel Douglass, he, the said James Ash, shall be in possession of any of the personal property of the said Rachel Douglas, received from the estate of her said late father, which may not be contracted to be laid out in the purchase of real estate, conformable to the provisions hereinbefore mentioned, then, and in such case, he, the said James Ash, shall and will account, with the said Charles Biddle and Charles French, their heirs or assigns, for the principal of all such monies, and well and truly pay and satisfy the same:* it being understood and expressly declared, that the said *James Ash* shall not be accountable for the interest or

(Biddle's Executors *v.* Ash.)

rent of any such monies or estates that may come to his hands during the joint lives of them, the said *James Ash* and *Rachel Douglass,* by reason of their intermarriage as aforesaid.    And, further, that in case the said *Rachel Douglass* shall survive the said *James Ash,* that then and in such case, his, the said *James Ash's* executors or administrators, shall, in like manner, be accountable for, and shall pay and satisfy the principal of all such monies, to the said *Rachel Douglass,* without being responsible for any interest or rents that may have accrued during the said coverture.    Provided, always, and it is understood and agreed, that, in case she, the said *Rachel Douglass,* shall survive him, the said *James Ash,* she shall not and will not have or claim any dower or thirds whatever, of, in or to his estate.    In witness whereof, &c."

On the fourteenth day of *March,* 1804, the day before the execution of the above indenture, the heirs of *Jacob Morgan,* including *Rachel Douglass,* conveyed the sugar house estate to *Edward Pennington.*

It was agreed that a verdict should be entered for the plaintiffs for six cents damages and six cents costs, subject to the opinion of the court upon the following points:

1. Whether the defendant is chargeable under his marriage settlement with *Rachel Douglass* of the 15th of *March,* 1804, with any and what portion of the money paid by *Edward Pennington* for the bonds given by him to *Rachel Douglass,* for the purchase money of the sugar house and premises in *Vine* street, sold and conveyed by the heirs of *Jacob Morgan* before the said settlement.

2. Whether the defendant is chargeable for the full amount of monies paid him by the executors of General *Morgan,* or is entitled to a credit for so much of the said monies as consists of interest accrued to the estate of the said General *Morgan* subsequently to the date of the said marriage settlement.

3. Whether the defendant is entitled to a credit, under the said settlement, for monies paid to fill up vacant lots, purchased for *R. Ash* and her heirs, and for paving and curbing opposite the same, or other property purchased by the defendant according to the said settlement.

It was further agreed, that the case, with the opinion of the court upon the above points, should be referred to three referees to be appointed by the court, to adjust the accounts of the parties accordingly, and that in the said adjustment, credit should be given to the defendant for so much of the inventory of the estate of the said *Rachel Ash,* and the interest thereof, (excluding the furniture therefrom,) as might be necessary to meet the demand of the plaintiffs; and the balance of the said inventory and interest, if any, to be paid to the said *James Ash:* That the report of the said referees being filed and approved, the court should have power, if any thing be due by the defendant, to enlarge the verdict accordingly, and en-

(Biddle's Executors *v.* Ash.)

ter judgment thereon; or if nothing should be due, to set aside the verdict and enter judgment for the defendant.

Either party to be at liberty, upon the report of the referees coming in, to file exceptions, introducing any other questions, which they may deem material.

*T. Sergeant* and *Chauncey*, for the plaintiffs.—1. There are two objects which it will be the desire of the court to effect in the construction of this settlement. The first, to preserve *as far as it can* be done, the legal rights of the wife and her children; the second, to give entire effect, if possible, to the deed. The legal right of the wife and her children, is the preservation of her real estate; and the court will be careful to prevent, if possible, the loss of this right by any mistake or misconception. The only mode of giving full effect to the instrument, is to consider the proceeds of sale to be comprehended in the conveyance of the thing sold. With these two objects in view, what is the sound judicial opinion upon the deed in question? It is not a case of reformation but of construction. Little will be gained of a satisfactory character by speculating upon the views of the parties, by any other lights than those derived from the instrument itself. From the instrument itself, *is* to be deduced the intention to secure to the wife, subject to the husband's enjoyment during life, her real and personal estate, derived from her father in the division of his estate. This is manifest from the recital and the description in the deed. The sugar house, sold the day before the execution of the settlement, was a very important part of that estate, and is treated as such in the instrument. Notwithstanding the prior sale, it is included in the deed as if it were still the property of the wife. It is plain that the intention was to settle this part of her property, and as the land had been sold, but the price remained to be paid, it was intended that the proceeds of sale should be settled under the description of the land itself. The court will, therefore, substitute the money for the land. To the suggestion, that the land having been sold the day before the execution of the deed, it did not pass to the trustees, and that to substitute the money in the place of it, would be to make a new contract for the parties, it may be answered, that the parties certainly meant something by the introduction of this estate into the deed. It was not matter of form; some substantial purpose was in view, and the only mode of giving effect to this part of the instrument, is to consider the parties as preserving the intention they had before the sale; that of including this portion of the property in the settlement. They knew, on the 15th, that the sale had taken place on the 14th, but they considered the money or the bonds of the purchaser, the same as the land, and, therefore, made no alteration in the instrument. The inference, that the wife knew the legal effect of a conversion of the property, and meant that the conversion should be followed by its legal consequences, is inconsistent with the retention of

(Biddle's Executors *v.* Ash.)

this part of the estate in the deed of settlement. The only reason that can be assigned for the execution of the instrument in the form in which it stood is, that the parties intended, that the conveyance in its existing form, should carry the money. No other motive can be imagined. This part of the deed could not have been left in as mere surplus matter, not of sufficient importance to call for another instrument. The settlement was executed with consideration and care, and no part of it can be considered as immaterial, if effect can be given to it. By considering the land, as including or representing the price to be paid for it, effect is given to the whole instrument; otherwise, this part of it is a dead letter; and thus the general intention of the parties, which was to secure the wife's property to herself and her children, is frustrated by a very large portion of it, being swept away on the eve of marriage. This construction is the most rational and satisfactory that can be given to the instrument in question.

Does the court possess the power to give it this construction? The court will construe a settlement according to the intent of the parties, though contrary to its literal expressions. 3 *Br. C. C.* 569. 2 *Eq. Ab.* 28. 1 *Fonb.* 136, 188, 190. Words describing the subject of a grant, are very different from words limiting the estate granted. The latter are technical, and the rule of law settles their construction: the former are not so, and are to be governed by intention. *M'Williams* v. *Martin*, 12 *Serg. & Rawle*, 269. In the present case, the court cannot carry the settlement into effect, literally, by saying that the land passes to the trustees, because it has been conveyed to another; but they may give substantial effect to the instrument, and fulfil the intention of the parties, by saying, they have agreed that the money shall stand in the place of the land. This construction injures no one. It does not injure the husband, because he agreed, by the settlement, that the land should be secured to the wife; and he is placed in no worse situation by its conversion into money. The substance of his agreement was, that her property should be secured, and equity requires that he should fulfil his agreement. These remarks apply to the general scope and character of the instrument.

The next question is, does the covenant of Mr. *Ash* embrace this money? It does so in terms. If, at the time of the decease of Mrs. *Ash*, he should be in possession of any of her personal property, received from the estate of her father, not contracted to be laid out in the purchase of real estate, he covenanted to account for the principal thereof to his wife's trustees. The money in question is personal estate of his wife, received from the estate of her late father; and if the letter of the instrument is to govern, the case is within the covenant.

2. Mr. *Ash* was to enjoy the interest of any monies which might come into his hands, from the time they so came into his hands, during the coverture; but there is nothing which gives him a larger interest.

(Biddle's Executors *v*. Ash.)

The personal property, at the execution of the settlement, was not ascertained; when ascertained it was to be paid, by the executors, to the trustees; and then, but not until then, the right of Mr. *Ash* to the profits attached.    His covenant, accordingly, is to account for the principal of 'all monies coming into his hands, but not for rents or interest.    Upon the literal construction of this covenant there can be no doubt; and the spirit of the settlement accords with it.

3. The expenses referred to in the third point, are of two kinds; first, Filling up vacant lots.    Secondly, curbing and paving.    They were either voluntarily incurred, or incident to the tenancy.    If voluntarily incurred, and for the improvement of the property, there is no pretence of legal right to have them allowed.    If they were incident to the tenancy, and no charge on the estate, he has as little legal right to an allowance.    If they were a charge on the estate, he equitably represents the charge, and the burden must be apportioned between him and those in remainder.

*Tilghman* and *Binney*, for the defendant.

1. The action is covenant upon the deed of the 15th of *March*, 1804; and the question is, whether there has been any breach of the defendant's covenants contained in that instrument?    If no covenant was broken in not accounting for the money received on *Pennington's* bonds, Mr. *Ash* is not chargeable with it.    The case does not present the question, whether that money ought to be regarded as land; and if it does, the money was hers, to do as she pleased with; and she has not chosen that it should be settled to her separate use.    The clear interpretation of the deed is, that *Ash's* covenant is expressly confined to the personal estate of *Jacob Morgan*, belonging to *Rachel Douglass*, and does not extend to the proceeds of the sale of his real estate.    With the particular real estate described in the settlement, he had nothing to do, as it passed to the trustees.    As to her share of her father's personal estate, he has covenanted, that all the purchases he should make with it, should be conveyed to his wife, her heirs and assigns, subject to certain powers of letting and exchanging; and if, at her decease, he should be in possession of any *personal property* of the said *Rachel Douglass, received from the estate of her said late father*, not contracted to be laid out in real estate, according to the previous provision, he further covenanted to account, to the trustees, for the principal.    The last covenant was supplementary to the first.    They both related to the same personal estate, viz., the personal property received from the estate of her father; and not to the proceeds of his real estate.    This construction cannot be avoided.    No personal property, except what was the personal property of *Jacob Morgan*, is assigned to the trustee.    There was no intention to provide for any other, by any provision in the instrument.    There is no knowledge of the existence of such personal estate as the bonds of Mr. *Pennington*, shown in Mr. *Ash*, who was an utter stranger

(Biddle's Executors *v.* Ash.)

to the sale of the sugar house estate.    To make a covenant at law, as to these bonds, by the terms of the settlement, is impossible.    It is equally impossible so to reform the settlement, in equity, as to make *a new covenant at law.*

As to the general question of equity, if any thing could be done, it would be to put the bonds in the same situation as the sugar house; to transfer them to the trustees to be invested in lands upon the same trusts.    But, such was not the destination of the personal property mentioned in the deed, which was to be invested in real estate, in the name of Mrs. *Ash,* her heirs and assigns: consequently, the reformation of the deed would not affect his covenant, as he had nothing to do with the matter reformed.    But, to justify any change in the instrument, that must be proved which cannot be proved. There is no evidence of any mistake or misapprehension, on the part of Mrs. *Ash,* at the execution of the deed.    She knew that this estate had been sold before the settlement, and, that, therefore, it did not pass.    She received part of *Pennington*'s first payment, and used it as she pleased.    When the bonds were paid off, she received three thousand dollars from *Ash,* which she disposed of as she thought proper.    Her trustees knew this, and never made a claim in her lifetime. She died in 1817, and no suit was instituted till 1824.    It does not appear to have been intended to tie up all her property: other real estate of great value, derived from her father, and personal property, in her possession, derived from her former husband, were not included in the settlement.    Her intention, in respect to the sugar house estate, as declared in the deed, was changed, as her own act, before its execution proved.    There was merely an omission, on her part, to strike out this part of the deed.    But, the mistake of Mrs. *Ash,* if it were shown, would not be sufficient to justify the reformation called for.    The mistake, both of the husband and wife, must be shown, and there is no evidence of mistake on the part of Mr. *Ash.*    He assented to the settlement, as it was offered, supposing the estate to be as described.    Had he known of the previous sale there is nothing to show that he would have assented to settle the money.    No intention appears, in him, to settle the personal estate, derived from the real estate of *Jacob Morgan.*    This is not a deed which chancery would alter.    It is a marriage settlement executed, of very land, and very personal estate.    Nothing else is included, and, with such a settlement equity would not meddle, except from evidence *aliunde.*    The case of articles, and a settlement in pursuance of them, is peculiar.    The court will not reform a settlement, according to the articles, where both are made before marriage, unless the settlement be declared to be in pursuance of the articles; for, before marriage, the parties may alter their intention, as to the terms of it, though they cannot afterwards.    The court will, therefore, suppose that the settlement was made in pursuance of the new agreement, and not of the articles.    But, with a deed completely executed, as this was, before marriage, equity will not

interfere. *Fearne*, 90, to 110. *Madd. Ch.* 61. 1 *Fonb.* 136, (*note.*) 396. The intention of the settler, in relation to the sugar house estate, was certainly altered. It was altered as to its passing as real estate; and there is nothing to show a new intention to pass it as personal estate. If the court alter this deed, they must make a new settlement, and impose new covenants on the defendant, or decree that the trustees recover this money, and invest it upon the same trusts which were intended, in respect to the sugar house, before the sale, for which there is no warrant.

2. The question, in relation to the interest, is easily disposed of. The defendant was entitled to his wife's personal property, *eo instanti* of the marriage. Whatever interest it accumulated after the marriage, was his. He was responsible for none which accrued during coverture, no matter into whose hands it may have come.

3. The defendant covenanted to invest the personal estate of his wife, derived from her father, in real estate, to be conveyed to her, her heirs and assigns; and, that if any of that money should remain in his hands, at her death, not contracted to be laid out in real estate, he would account for it with the trustees. He laid out money in the purchase of vacant lots, for which he is credited. He also laid out money in filling up those lots, and in curbing and paving in front of them; and the question is, whether or not he is entitled to credit for those expenditures? He, clearly, is entitled to such a credit. The money thus expended, formed part of the price of the lots. A lot, before it is filled up, is worth one sum; when filled up, it is worth a greater sum. The cost of the lot, therefore, consists of two parts; the price paid for it before it is filled up, and the money expended in filling it up, and putting it in a situation to be used according to the city regulations. The same remark applies to the curbing and paving. If these expenses had been incurred immediately after the purchase, no doubt would have existed; their having been incurred after a considerable lapse of time, can make no difference. The principle is not affected by time. The defect does not arise after purchase, but is a pre-existing and permanent one. Until the lots are filled up, they can yield no revenue. This expense, therefore, enters into the prime cost of the land, and should be credited to the defendant, as coming within the words, and certainly within the spirit of the covenant. It was incurred for the benefit of the wife and her heirs, and, consequently, the question, how the burden shall be apportioned between the tenant for life, and the remainder man, does not arise.

The opinion of the court was delivered by

GIBSON, C. J.—It is conceded, that this is not a case of accident or mistake, calling for the intervention of a chancellor to reform the instrument; but one purely of construction. At law, it is the case of a contract *executed,* and passing nothing but *real* estate, actually

in the grantor at the time of the delivery; and it can be turned into an *agreement* in equity, only to subserve some clear and indisputable intention inconsistent with the legal effect of the instrument. Here that effect is to pass nothing; for nothing, as regards the *Vine* Street property, the proceeds of which are in contest, was in the parties. The only case in which an interest, resembling the present, has been held to pass by a conveyance of the land, is that of a grantee of lands, within the seventeen townships which had been certified to a *Connecticut* claimant; (*Evans* v. *The Commonwealth,* 2 *Serg. & Rawle,* 448,) and there the grantee was permitted to recover the compensation allowed by the state; but only because it was considered, that before compensation made, the divestiture was incomplete. What proof then have we that the proceeds of the *Vine* Street property were intended to be substituted for the property itself? The actual intent can neither be ascertained nor conjectured. The parties may possibly have supposed, that the proceeds would be covered by the defendant's covenant to account for his wife's personal property, derived from her father's estate, of which he should be possessed at her death; and if such a supposition were clearly disclosed, it might, perhaps, give rise to an equity which we ought not to disregard; or, what is more probable, they may have intended to withdraw the property from the operation of the settlement altogether; and, for either of these reasons, a new conveyance, adapted to the altered circumstances of the case, may have been deemed unnecessary. But the first is inconsistent with the notion, which has been earnestly pressed on us, that the proceeds passed by the grant of the property itself; with, or without which, I am unable to perceive how the plaintiff can make out a case. If they passed by this, which is the only operative clause in the deed, they did so with all the attributes of real estate, and subject to the uses and limitations expressly attached to them as such; consequently, the defendant would be entitled, during his life, as tenant by the curtesy. If they did not pass by that clause, then the deed contains no clause applicable to them; and the act of turning the property into personalty, would have the effect of subjecting it to the defendant's marital rights, and giving it to him absolutely. For it is only by introducing the proceeds into the settlement, as a substitute for the estate, that they can be made out to be the personal property of the wife, and subject to the husband's covenant to account for them as such, being derived from her father's estate. But it is impossible to treat the proceeds as real estate, only for the purpose of giving the wife an interest, and personal, for the purpose of subjecting it to the husband's covenant. It may be either the one or the other; but it will, necessarily, be attended, throughout, with all the incidents of the character, which we shall first attribute to it; and this is a dilemma from which I see no escape.

The true construction is, however, that it did not pass at all.

(Biddle's Executors *v.* Ash.)

That the parties intended to include the *Vine* Street property, when the conveyance was prepared, is perfectly clear; but it is equally clear that they had changed their intention when it was executed. It is nearly impossible to refer their having parted with the title, in the mean time, to any other motive.   If there were no other estate on which the conveyance could operate, that would make the case a perplexing one; perhaps any construction would be adopted to prevent the deed from becoming a nugatory act.   But here, there was a large estate besides, which passed by the conveyance.   It was, no doubt, believed, that the retaining of the clause which relates to the *Vine* Street property, could do no harm, as nothing was left for its operation; and the existence of it is attributable to a change of intention, without a correspondent change in the terms of the conveyance having been deemed necessary.   An analagous construction is always adopted in the case of a settlement preceded by articles, and executed before the marriage; which will not be reformed so as to render it conformable to the articles, unless it purport to have been made in pursuance of the articles, or there be proof of mistake *dehors;* the variance being attributed to a change of intention, which the parties had a right to make.   Here there is nothing to indicate the existence of any but a partial change of intention, or, if there were, to raise an equity from it; the legal construction being the natural one,—that the parties intended to withdraw the *Vine* Street property from the settlement altogether, leaving the proceeds of it to the legal consequences of the marriage.   A contrary intent, clearly and explicitly made out, is necessary to the success of the plaintiff's case; without which we cannot hold the defendant accountable.

That the defendant is not bound to account for monies received from the executors of the wife's father, in the shape of interest, which accrued subsequently to the date of the settlement, when he became entitled to the use of the principal, is so entirely consistent with reason and the intention of the parties, that it is but necessary to state the proposition, without entering into a particular discussion of it.

.   The remaining inquiry is, whether the defendant is entitled to a credit for filling up certain vacant lots which he purchased for the benefit of his wife, pursuant to the settlement, and for paving and curbing opposite to them.   The paving and curbing, it seems, were required by the ordinances of the city, and it has very properly been conceded, that this part of the charge is unobjectionable. But I cannot perceive how expense incurred in filling up and rendering the lots productive, can be distinguished from it.   The settlement ought, in this respect, to be beneficially construed in favour of the object, and all this expenditure may, therefore, be fairly put down to the original cost.   On all the points we are of opinion with the defendant.

Judgment for the defendant.