Barbara **FARRIS**, Plaintiff-Appellant,

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES,** Defendant-Appellee.

No. 84–5808.

United States Court of Appeals, Sixth Circuit.

Argued June 12, 1985.

Decided Sept. 18, 1985.

---

**10.** The record does not contain the date when Spencer was laid off from his day job.

Karen P. Dennis, argued, Memphis Area Legal Services, Inc., Memphis, Tenn., for plaintiff-appellant.

W. Hickman Ewing, Jr., U.S. Atty., Alice A. Howze, argued, Memphis, Tenn., for defendant-appellee.

Before MERRITT and WELLFORD, Circuit Judges, and SPIEGEL, District Judge.*

MERRITT, Circuit Judge.

Plaintiff Barbara Farris appeals from a judgment of the District Court affirming the Secretary's final decision to deny her Supplemental Security Income (SSI) Benefits under 42 U.S.C. § 1381 *et seq.* After three prior denials, Mrs. Farris filed the application at issue here on March 22, 1982, alleging that she became disabled on November 20, 1981, due to seizure disorders and headaches. On September 23, 1982, the ALJ concluded that Mrs. Farris was not disabled because she did not suffer from a severe impairment. After the Appeals Council denied review, the District Court affirmed and adopted the Magistrate's opinion affirming the Secretary's decision. Because we find that the ALJ applied an overly strict definition of severity, we reverse and remand for further proceedings.

## I.

At the time of the hearing before the ALJ, Mrs. Farris was a 36 year old divorcee living with her four children. She had an eleventh grade education and could read

---

* The Honorable S. Arthur Spiegel, Judge of the United States District Court for the Southern District of Ohio, sitting by designation.

and write but could not do arithmetic. T. 45–47. One measurement placed her IQ at 74, which is classified as borderline mental defective. T. 201. She had work experience as a housekeeper, secretary and cashier, and quit work as a maid at the Peabody Hotel in the fall of 1981 because of recurrent seizures, during which she would first shake violently, then pass out and fall to the ground, and after which she was left weakened for two to three days afterward. T. 48–50, 52–54.

Mrs. Farris testified that she suffered from a wide variety of maladies, including chest wall pain, anxiety, hypoglycemia, and "racing heart." T. 50–60. Medications prescribed for her include Dilantin and Phenobarbital for seizures, Valium for chest pains and shortness of breath, Tolectin, and nitroglycerine for her heart condition. She stated that her children took care of her household chores, and that she normally spent her days inactively at home, often not even bothering to dress. T. 58.

The record clearly shows that Mrs. Farris has suffered from headaches, seizures and chest pains for several years, but it is equally clear that there are no physical impairments that would account for these problems. Both chest x-rays, T. 153, and CAT scans and electroencephalograms, T. 183, 185, 194–95, 198, 208, have been normal. Rather, Mrs. Farris' symptoms have been repeatedly diagnosed as psychogenic in origin, caused by a history of several traumatic rapes and muggings, a disturbed, disorganized home life and a condition of anxiety and neurotic depression. (See the reports of Dr. A. Jones, her treating physician, T. 139; L.D. Hutt, a psychologist who treated her from 1980 until late 1981, T. 186; A. Roberge, a neurologist in Dr. Hutt's office, T. 208; and H. Lynn Fann, a social worker, T. 221.) The most extensive reports, compiled by Dr. Hutt, her treating psychologist, describe Mrs. Farris as meeting "all the diagnostic criterion [sic] for somatization disorder," T. 186, experiencing chronic severe headaches, pain in her chest and neck, and anxiety attacks accompanied by hyperventilation, symptoms which were present over a peri-od of several years, and over which Mrs. Farris "has no conscious control" and which she believes to be genuine physical disorders.

The Diagnostic and Statistical Manual of Mental Disorders, Third Edition, describes Somatization Disorder as characterized by "recurrent and multiple somatic complaints of several years' duration for which medical attention has been sought but which are apparently not due to any physical disorder." Appellant's Brief, at 47. There is no evidence in the record to indicate that Mrs. Farris does not have this disorder; the conflict in the evidence is in the physicians' opinions regarding the consequences of this disorder for Mrs. Farris' ability to understand and carry out instructions and tasks, to relate to others, and therefore to engage in substantial gainful activity. Her own physician, Dr. Jones, opined that she was unable to engage in substantial gainful activity in 1979. T. 139. Dr. Hutt, her psychologist, stated that Mrs. Farris' daily activities were extremely restricted, but that she could relate to nonfamily members in an adequate manner, could handle her own welfare checks and understand simple oral instructions, but her ability to carry out such instructions would be severely limited during times when her symptoms were prevalent. T. 187. He concluded that "she is definitely unable to meet any production standards or to sustain work with adequate attendance." *Id.* This 1981 report was reinforced by psychiatrist Kloeck's 1982 conclusion that Mrs. Farris was "unable to function at this time." T. 204. Finally, social worker Fann stated that Mrs. Farris could not "cope adequately with work." T. 221.

The conflicting conclusions are, not surprisingly, supplied by consulting and examining physicians hired by the Secretary. Examining neurologist Aldo Bevilacqua stated in August, 1981, that Mrs. Farris was not suffering from a neurological seizure disorder and that her symptoms were compatible with hysterical neurosis, conversion type, T. 194, and in September, 1981, concluded that she could understand basic

instructions, relate to co-workers and supervisors, and was able to sustain work and meet quality and production standards, even though she continued to have no insight into her condition, was unlikely to improve and had a "guarded" prognosis. T. 198. Dr. William Little, a clinical psychologist, examined Mrs. Farris, but, remarkably enough, his report contains absolutely no mention of any somatization disorder, although it does conclude that she has no disabling conditions and can function adequately and independently in gainful employment. T. 200–01. The reports of these two examining doctors were reviewed by consulting physicians Fishbein and Arnold, who cursorily summarized the examination reports and concluded that Mrs. Farris had no disabling or limiting conditions and that she should be denied benefits. T. 188, 199.

The ALJ reviewed this evidence, and, expressly noting the conflicting medical reports, found that the medical evidence failed to substantiate a physical or mental impairment that prohibited Mrs. Farris from engaging in daily activities and precluded her being gainfully employed. T. 28. The ALJ did not disbelieve the reality of Mrs. Farris' physical symptoms, but ruled that she did not have a "severe" condition and therefore could not be found to be disabled. He therefore denied her request for benefits.

On June 15, 1984, District Judge Gibbons adopted and affirmed the Magistrate's report recommending that the decision of the ALJ denying benefits be affirmed. The District Court stated that the ALJ's decision was supported by substantial evidence, and based on a correct application of the statutory disability standards, thereby rejecting the claimant's contention that the ALJ had circumvented the Secretary's own sequential evaluation process by applying the listings of impairments as solely determinative of disability or by applying an overly strict standard for determining whether Mrs. Farris' impairment was severe under 20 C.F.R. § 416.921(b). This argument was based on the Magistrate's view that the ALJ had found that Mrs.

Farris' impairment was not severe, Appellant's Brief, at 18, and that the ALJ also "at least inferentially" concluded that her impairment did not meet or exceed the severity of a listed impairment. In fact, the ALJ simply found that Mrs. Farris did not have a severe impairment, and he did *not* rule that her impairment did not meet or exceed a listed impairment.

## II.

Under 42 U.S.C. § 1382c(a)(3)(A), (B), a person is considered disabled and eligible for SSI if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" and the impairment is of such severity that the person "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful activity which exists in the national economy." Under 42 U.S.C. § 1382c(a)(3)(C), "a physical or mental impairment is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." The standard for review of SSI disability determinations is whether the Secretary's decision is supported by substantial evidence. 42 U.S.C. § 1383(c)(3).

Under the sequential disability evaluation procedure promulgated by the Secretary and codified at 20 C.F.R. § 416.920, the statutory test for disability is broken down into a five step inquiry. An initial determination is made as to whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is found "not disabled." Second, the ALJ must find that the claimant has a severe impairment or impairments. A severe impairment is defined in the negative; 20 C.F.R. § 416.921 states that a nonsevere impairment is one that "does not significantly limit [the claimant's] physical or mental abilities to do basic work activities." If the claimant does not have a severe

impairment, she is found "not disabled." If a severe impairment is found, then the ALJ compares the claimant's impairment against those listed in Appendix 1, 20 C.F.R. Subpart P, to see if, on the medical evidence alone, the claimant can be found to be disabled. If the claimant does not qualify as disabled solely on the basis of the listings, then residual functional capacity is determined, that is, the level of work the claimant is able to perform (sedentary, light or medium). If the claimant is found unable to return to past work, then her age, education and work experience are considered along with her residual functional capacity to determine whether there is other work in the national economy which she can perform. *See* 20 C.F.R. § 404.1520.

■ The ultimate goal of this sequential process is the rational and fair determination of whether the claimant meets the underlying statutory test for disability— whether, considering the person's age, education, and work experience, a medically determinable impairment has rendered her unable to engage in substantial gainful activity existing in the national economy. The process as a whole is designed to serve the interests of both individualized justice and administrative efficiency. *See* J. Mashaw, Bureaucratic Justice, 20–34 (1983). This Court has recently observed that the final-stage inquiry, in which the medical-vocational grid is applied to exertional impairments, involves some sacrifice of individualized treatment, "yet provides greater uniformity with fewer administrative costs." *Kirk v. Secretary of Health and Human Services,* 667 F.2d 524, 530 (6th Cir.1981), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the grid as a proper exercise of statutory authority). The present case similarly requires us to identify the function and meaning of the earlier, second-stage requirement that the claimant demonstrate a severe impairment.

A nonsevere impairment is defined by the regulations as one that does not significantly limit the claimant's ability to do basic work activities. Examples of basic work activities listed in 20 C.F.R. § 416.921 include "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting." Preceded by the obviously necessary determination of whether the claimant is currently working, and followed by either the determination of disability on medical grounds alone (the listing of impairments) or consideration of residual functional capacity in light of the availability of suitable jobs, the second stage severity inquiry, properly interpreted, serves the goal of administrative efficiency by allowing the Secretary to screen out totally groundless claims. This purpose is demonstrated not only by the structure of the sequential evaluation process as a whole, but by administrative history which shows that recodification of the Secretary's regulations in 1978 and 1980 did not alter the level of severity for a finding of not disabled on the basis of a finding of a nonsevere impairment—a level defined by the original 1968 regulations as "a slight neurosis, slight impairment of sight or hearing, or other slight abnormality or a combination of slight abnormalities." *See Brady v. Heckler,* 724 F.2d 914, 919 (11th Cir.1984).[1]

■ In addition, an overly stringent interpretation of the severity requirement would violate the statutory standard for disability by precluding administrative determination of the crucial statutory question: whether, in fact, the impairment prevents the claimant from working, given the claimant's age, education and experience. We therefore agree with the Eleventh Circuit's view in *Brady* that in order to ensure

1. Recent District Court decisions have similarly stated that the regulatory severity test is only an "administrative convenience" designed to screen out totally groundless claims, and have reversed benefit denials based upon an overly strict interpretation of severity. *See McCullough v. Heckler,* 583 F.Supp. 934, 936–39 (N.D.Ill.1984); *Clemente v. Schweiker,* 564 F.Supp. 271, 273 (E.D.N.Y.1983); *Scruggs v. Schweiker,* 559 F.Supp. 100, 103 (M.D.Tenn.1982).

consistency with statutory disability standards, an impairment can be considered as not severe, and the application rejected at the second stage of the sequential evaluation process, only if the impairment is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience." 724 F.2d at 920. *Accord Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir.1984).[2]

Under this standard, the question in the present case is whether there is substantial evidence in the record supporting the ALJ's finding that Mrs. Farris has only a "slight" impairment that does not affect her ability to work. Substantial evidence means more than a mere scintilla of evidence, such evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Kirk*, 667 F.2d at 535. Here, the only evidence that Mrs. Farris' ability to do basic work activities was unaffected by her sudden seizures and fainting spells was provided by physicians hired by the Secretary to examine her, and the psychologist hired by the Secretary did not even mention her symptoms or her somatization disorder. It is well settled that opinions of treating physicians should be given greater weight than those held by physicians whom the Secretary hired and who only examined the claimant once. *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir.1983) (citing *Stamper v. Harris*, 650 F.2d 108, 111 (6th Cir.1981); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir.1980)). In light of the fact that Mrs. Farris' treating psychologist and psychiatrist stated unequivocally that she could not meet production standards and could not carry out basic instructions when her symptoms were prevalent, the ALJ's deci-

sion that she does not have a severe impairment must be reversed as unsupported by substantial evidence.

Mrs. Farris contends that the ALJ also erred in assuming that neurotic disorders may not be disabling, and argues that her disorder would qualify under a recently proposed listing for somatization disorders. Since the ALJ stopped at the severity stage in the evaluation process and did not reach the question of whether Mrs. Farris' disorder met or exceeded the severity of a listed impairment, it is inappropriate for us to consider these questions at this juncture in the case, although they must be determined by the ALJ on remand.

Accordingly, the case is remanded to the Secretary for further administrative proceedings consistent with this opinion.

WELLFORD, Circuit Judge, dissenting.

As the majority correctly notes, the Secretary's evaluation procedures, 20 C.F.R. § 416.920, are designed to promote both individualized justice and administrative efficiency. The majority correctly sets forth the statutorily defined five step evaluation procedure, and recognizes that this court's function is not to reweigh the evidence *de novo* but rather to determine whether substantial evidence supports the Secretary's decision. Correct application of the statutory test and proper review of the evidence presented in this case, I believe, mandates affirmance. Accordingly, I dissent.

## I. ADMINISTRATIVE RES JUDICATA

Claimant filed three prior applications for Supplemental Security Income in May 1977, July 1979, and March 1981 respectively. Each of these applications was denied. The Secretary, in response to claimant's March 1981 application, found claimant suffering from a somatization disorder, R. 82, the same disability raised in claimant's

---

2. This definition of a severe impairment is fully consistent with and, complementary to, our recent ruling in *Mowery v. Secretary, HHS*, 771 F.2d 966 (6th Cir.1985), that the Secretary's interpretation of when an impairment "significantly limits" the ability to do basic work activities and

consequently constitutes a severe impairment was unreasonably restrictive, given the dictionary definition of "significant" as "having or likely to influence or effect: deserving to be considered."

most recent application, and yet denied benefits. Now on her fourth application, claimant states that her alleged impairment began at birth,[1] R. 87, and fails to present any evidence to suggest that she now has additional disabilities or that the disorder diagnosed and considered in her third application has in any way worsened.

As the Supreme Court stated in *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966): "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." Indeed, in Social Security cases, courts have applied administrative *res judicata* principles to prevent the Secretary from terminating benefits once given:

> After a final determination of disability, if a termination of benefits were effected without a showing either of improvement or newly-discovered evidence, such a termination would of necessity be based on whim or caprice or would constitute an impermissible relitigation of facts and determinations already finally decided.

*Shaw v. Schweiker*, 536 F.Supp. 79, 83 (E.D.Pa.1982); *see also Simpson v. Schweiker*, 691 F.2d 966, 969 n. 2 (11th Cir.1982); *Harris v. Heckler*, 756 F.2d 431, 439–40 (6th Cir.1985) (Wellford, J., dissenting). Here, I believe that unless the claimant can show a worsening of her condition since her prior three applications, an award of benefits would be unjustified and would lead to repeated applications for disability by claimants hoping that a new ALJ and court would view the same evidence in a different fashion.

Of course, administrative *res judicata* should not be applied with the inflexibility with which judicial *res judicata* must be applied. *See* 2 K. Davis, *Administrative Law Treatise* 548 (1958). The Social Security Regulations, in fact, authorize reopening of otherwise final determinations upon a finding of good cause or for correcting clerical errors. 20 C.F.R. § 404.957.

The majority notes that use of the medical-vocational grids was found to be a proper exercise of statutory authority, in part because it "provides greater uniformity with fewer administrative costs." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 530 (6th Cir.1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). Yet permitting a claimant to reapply year after year without showing changed conditions will not promote uniformity, can only increase the administrative costs, and works a disservice to the interests of justice.

## II. SUBSTANTIAL EVIDENCE

Notwithstanding the administrative *res judicata* problems presented in this case, substantial evidence supports the Secretary's denial of benefits. As the majority itself notes, under the regulations an impairment is non-severe if it "does not significantly limit [the claimant's] physical or mental abilities to do basic work activities." 20 C.F.R. § 416.921. Basic work activities include "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting." *Id.* Substantial evidence shows that claimant's somatization disorder is not significantly limiting.

Dr. Bevilacqua, a licensed psychiatrist, specifically addressed claimant's abilities concerning each basic work activity:

> Her ability to relate to co-workers and supervisors in a work situation ... appears to be very adequate. She is able to understand, remember and carry out one and two step instructions and use common sense and her ability to respond appropriately to ordinary work pressures and behave independently in a standard-

---

1. The majority states that claimant became disabled on November 20, 1981. Yet in her fourth application, in answer to the unambiguous question "date impairment began," claimant equally unambiguously, responded "since birth," R. 87.

ized work situation is at this point adequate.

R. 198.

Dr. Hearn, a psychological examiner, and Dr. Little, a clinical psychologist, noted:

On the basis of the history, interview and test results it is my opinion that this claimant has no disabling conditions of a psychological nature. I think [claimant] would be able to function adequately and independently in gainful employment. She would be able to understand, remember and carry out simple verbal instructions under ordinary supervision, relate appropriately to supervisors and co-workers and meet quality and production standards.

R. 201. After reviewing claimant's abilities to perform basic work activities, and after applying "medically acceptable clinical and laboratory diagnostic techniques," see 42 U.S.C. § 1382c(a)(3)(C), these doctors found that claimant was not suffering from a severe disability. Under the majority's own analysis, "[i]f the claimant does not have a severe impairment, she is found 'not disabled.'" The Secretary need go no further in her analysis.[2]

Notwithstanding Dr. Hutt's April 21, 1981 pessimistic diagnosis that "[claimant] is definitely unable to meet any production standards or to sustain work with adequate attendance," R. 187, claimant did work until October 20, 1981, a full six months after Dr. Hutt's pronouncement.

While the Secretary should give more weight to the opinion of a claimant's treating physician than to that of one the Secretary has hired and who has examined a claimant only once, see Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1054 (6th Cir.1983), the Secretary need not and indeed should not ignore the opinions of her own physicians. When, as here, external objective facts support

the opinion of the Secretary's doctors, and not that of the claimant's treating physician, the Secretary in her discretion may properly make credibility findings in favor of her own physicians.

Substantial evidence supports the Secretary's denial of benefits. I would AFFIRM for the reasons stated.

---

**2.** The majority notes that the ALJ "did *not* rule that her impairment did not meet or exceed a listed impairment" even though the ALJ found that claimant "did not have a severe impairment" (emphasis in original). If a claimant does not have a severe impairment then a *fortiori* she does not meet a listed impairment, since listed impairments are those that are so severe that disability is presumed.