805 F.2d 1037
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Maebe WILLIAMS, Plaintiff-Appellant,
v.
Margaret HECKLER, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 85-1842.
 United States Court of Appeals, Sixth Circuit.
 Oct. 30, 1986.
 
 Before MILBURN and BOGGS, Circuit Judges, and EDWARDS, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant Maebe Williams appeals from a district court order affirming the final decision of the Secretary of Health and Human Services denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. Sec. 423. The final decision of the Secretary is that plaintiff failed to establish the existence of a severe impairment, thus terminating the sequential evaluation at step two. For the reasons that follow, we reverse and remand.
 
 I.
 
 2
 On June 1, 1982, plaintiff filed an application for disability benefits alleging she became disabled on December 14, 1981, due to "back problems, neck and hips." Plaintiff's application was denied initially and upon reconsideration. Plaintiff then requested and was granted a de novo hearing before an Administrative Law Judge ("ALJ"), which was conducted on March 16, 1983. The ALJ denied plaintiff benefits, and the Appeals Council affirmed. On February 16, 1984, the district court remanded to the Secretary for a second de novo hearing because a transcript from the first hearing was lost.
 
 
 3
 On July 24, 1984, a de novo hearing was held before a second ALJ. Plaintiff testified that she was born June 19, 1928. She weighed 193 pounds and was five feet two inches tall. She did not finish the fourth grade and could not read or write. Between 1965 and 1981, she was employed as a spot welder, which required her to lift up to twenty pounds.
 
 
 4
 Plaintiff testified that her biggest problem was pain in the low back and in her feet and hands. She could sit for one-half hour, then she had to walk around or lie down. She could stand five minutes, then she got pain, tingling and numbness in her legs, and pain in her back. She could not bend, stoop or climb stairs because of the pain. She could only turn her head one quarter of the way, and her hands would get numb and she would get cramps in her fingers. Plaintiff also complained of dizziness and was taking medication to control high blood pressure.
 
 
 5
 The medical evidence presented included the records of plaintiff's treating physician, Dr. Evelyn P. Navarro, a neurologist. On January 20, 1982, Dr. Navarro's examination of plaintiff revealed neck spasms and neck muscle stiffness with tenderness and soreness on pressure of the cervical region. Plaintiff had limitation of movement in all directions. Cranial nerves, deep tendon reflexes, sensory exam, and plantar's flexion were all normal. Straight leg raising was negative. Dr. Navarro's impression was "cervical strain, with muscle spasms; rule out cervical spondylosis; and lower back strain." Dr. Navarro recommended physical therapy. On January 26, 1982, Dr. Navarro had an electromyograph and a nerve conduction study performed. These tests revealed no denervation.
 
 
 6
 On March 17, 1982, Dr. Navarro reported that plaintiff's blood pressure was 140/90. Plaintiff's range of motion was limited in all directions, and she could hardly move her neck beyond 5 degrees in any direction. She had severe tenderness in the cervical spine. The lumbosacral area was soft, but no spasm was noted. The lumbar spine exhibited some tenderness. Straight leg raising was negative to 75 degrees. She could bend forward 35 degrees and laterally to 15 degrees. Motor exam did not show any weakness in the upper or lower extremities. Deep tendon reflexes, plantar's and sensory exam were all normal. Dr. Navarro prescribed mild pain relievers and continued physical therapy.
 
 
 7
 On May 15, 1982, Dr. Navarro reported that plaintiff told her that her neck and shoulder were much better. Plaintiff told Dr. Navarro that she could walk one or two blocks before she suffered severe pain, but could not bend over without suffering increased pain. She was taking Motrin and Roboxin, which eased her pain. Dr. Navarro stated that the examination of the neck area revealed lateral rotation was limited to 10 degrees. However, flexion and extension were full. There was cervical tenderness but no spasms. Straight leg raising was 90 degrees bilaterally, and she could bend forward 45 degrees. There was lumbar tenderness but no spasms. Motor exam, sensory exam, reflex exams, cerebellar functions, and gait were all normal. Dr. Navarro again prescribed mild pain relievers and continued physical therapy.
 
 
 8
 On June 10, 1982, plaintiff told Dr. Navarro that physical therapy had improved her condition. Examination of her cervical and lumbar spine were unremarkable except for limited cervical lateral rotation, lumbar lateral bending limited 10 degrees, and minimal muscle spasm in her lower back. On June 29, 1982, x-rays of the chest revealed no significant change since x-rays taken on May 5, 1979. The doctor's impression was slight ectasia of the aorta and an otherwise negative chest. Dr. Navarro again prescribed mild pain relievers and continued physical therapy. Dr. Navarro advised plaintiff not to work for another four weeks.
 
 
 9
 On August 9, 1982, plaintiff indicated to Dr. Navarro that she was not doing as well as before. Examination revealed lateral cervical rotation limited to 10 degrees. Full flexion extension caused pain. There was cervical tenderness and lumbosacral tenderness without spasms. Straight leg raising was positive at 85 degrees. She could bend to 60 inches from the ground. Motor exam revealed minimal infraspinatus weakness. The rest of the muscles were intact. Reflexes, senses, and gait were all normal. Dr. Navarro again prescribed mild pain relievers and advised plaintiff to continue cervical traction and exercises at home.
 
 
 10
 On October 4, 1982, plaintiff reported to Dr. Navarro that she had started having neck pain while vacuuming. Her neck muscles were tight, but lower spine was fine. Examination revealed tight neck, trapezius, and cervical muscles. She had neck spasms. Her shoulder was normal. Flexion and extension were limited to 15 degrees. Reflexes and gait were normal. Straight leg raising was 85 degrees bilaterally. Dr. Navarro scheduled physical therapy.
 
 
 11
 On November 11, 1982, Dr. Navarro's examination of plaintiff revealed blood pressure of 160/80. Neck flexion was full, but extension was limited to 15 degrees. Side rotation was 15 or 20 degrees. Her neck and trapezius muscles were tight. Her right and left shoulder range of motion was full, and she could lift up, extend, and abduct without much pain. She had no upper extremity motor weakness. She could bend 35 degrees, and her reflexes were normal. Straight leg raising was 60 degrees bilaterally. Plaintiff's examination was basically the same on December 13, 1982, except cervical lateral rotation, chin flexion, and neck flexion were about 25 degrees, and straight leg raising was over 85 degrees bilaterally. Dr. Navarro diagnosed lumbosacral strain and spasms and cervical strain and spasms. Dr. Navarro prescribed mild pain relievers and advised that plaintiff not work for another six weeks.
 
 
 12
 On January 27, 1983, Dr. Navarro's examination of plaintiff revealed full neck flexion, extension limited to 10 degrees, and lateral rotation limited to 15 degrees. There was minimal lumbosacral muscle spasm, and she could bend forward 35 degrees. Straight leg raising was 65 degrees bilaterally. There was no motor weakness, no sensory loss, and no reflex abnormality. There was limitation in claimant's shoulder extension and abduction, particularly on the right side. Dr. Navarro prescribed mild pain relievers.
 
 
 13
 On March 9, 1983, Dr. Navarro reported that plaintiff's neck extension was 5 degrees, lateral rotation was 15 degrees, and flexion was full. Range of right shoulder motion was limited. Muscle strength, reflexes, gait, and sensory examination were normal. Straight leg raising was 60 degrees bilaterally. On August 18, 1983, plaintiff reported to Dr. Navarro that her neck was better. Plaintiff's right shoulder was limited but not her left. She could hardly move her right arm because of the pain. The doctor's examination revealed limited neck range of motion and right shoulder rotation. Abduction and extension were limited. Dr. Navarro prescribed mild pain relievers.
 
 
 14
 On November 28, 1983, plaintiff reported to Dr. Navarro that her high blood pressure was under control. Her neck felt much better, her left shoulder was better, and her right shoulder was still a little bit painful. Overall, plaintiff was happy her pain was less. Lateral rotation was limited but over 15 degrees. Extension was limited to 15 degrees. Right shoulder extension was increased. Muscle strength, reflexes, senses, and gait were normal. Her blood pressure was 130/80. Dr. Navarro noted similar statements of improvement by claimant on March 16, 1984. Dr. Navarro diagnosed cervical sprain, improved shoulder bursitis, cervical tightness, and spondylosis.
 
 
 15
 On June 8, 1984, Dr. Navarro reported that plaintiff's blood pressure was 130/80 and that her range of neck motion was much better. Bilateral shoulder range of motion was full. Straight-leg raising was 65 degrees bilaterally. She could bend forward 35 degrees. Dr. Navarro prescribed mild pain relievers.
 
 
 16
 On January 10, 1983, Dr. Howard J. Shaubel, an orthopedic surgeon, reported the results of his examination of plaintiff. Plaintiff's active neck flexion was 30 degrees, but he could increase it to 35 degrees. Active neck extension was 20 degrees, but he could increase it to 30 degrees. Plaintiff rotated her neck right to 25 degrees, but he could increase it to 40 degrees. Left neck rotation was 55 degrees, but he could increase it to 65 degrees. Plaintiff's active shoulder flexion was 160 degrees. Abduction was 100 degrees on the right and 120 degrees on the left. The doctor could increase abduction to 130 degrees without increasing the pain. Internal rotation of the right shoulder was 75 degrees and rotation of the left shoulder was 80 degrees. External rotation of the right shoulder and left shoulder was 90 degrees. Upper extremity reflexes were normal.
 
 
 17
 Dr. Shaubel found plaintiff's gait and heel and toe walking normal. Plaintiff had 35 degree hip flexion with complaints of pain. She could bend forward within four inches of the floor. Right lateral lumbar flexion was measured at 10 degrees with complaints of pain in her right upper and middle group of trapezius muscles. Left lateral flexion was 10 degrees with complaints of soreness in the right trapezius and low back. Other reflexes, muscle strength, sensory exam, and straight leg raising were normal.
 
 
 18
 There was pain to pressure at the lumbosacral junction. Hip testing was normal. Lumbar x-rays were interpreted by Dr. Shaubel to show bilateral sclerosis of the sacroiliac joints, generalized osteoporosis, normal disc space, small spurs in the lumbar region, sclerosis at L4-5, and lumbosacral articular facet. A cervical x-ray revealed osteoporosis, elongated transverse process at C7, calcification at C6-7, a long spur at C5-6, and a calcium deposit in the ligament of C7, B1.
 
 
 19
 Dr. Shaubel diagnosed bilateral trapezius myositis, spinal osteoporosis, shoulder adhesive capsulitis, L4-5-SL sprain; bilateral ilio-lumbar ligament sprain, sclerotic ileitis, right great trochanteric bursitis, lower extremity vascular deficiency, and C5-6-7 cervical discogenic disease. Dr. Shaubel further concluded that plaintiff could not work in the field of common labor.
 
 
 20
 On January 16, 1983, plaintiff was examined by Dr. Raymond R. McPeek, an internist. Dr. McPeek reported degenerative changes at the base of the cervical spine. He reported that plaintiff would not allow rotation of the cervical spine of more than 10 degrees to the left and 15 degrees to the right because of pain. Straight leg raising was negative. She had only 10 degrees of internal rotation of the right hip. Dr. McPeek diagnosed degenerative disc and joint disease of the cervical and lumbar spine, osteoporosis, osteitis condensans ilii, and obesity. Dr. McPeek concluded that plaintiff was disabled from doing her prior work and possibly from doing even sedentary work.
 
 
 21
 On January 12, 1983, Dr. James R. Glessner, an orthopedic surgeon, prepared a medical/vocational assessment of plaintiff. He reported that plaintiff could sit one-half to one hour, lift and carry no more than ten to fifteen pounds, stand one-half to one hour, walk one city block, handle light objects, do no bending, and should avoid pushing and pulling. She could see, hear, speak, and had no environmental limitations.
 
 
 22
 On May 11, 1982, Dr. D.J. Rosen, a radiologist, examined x-rays of claimant. He reported that the lumbar spine series showed no acute fractures or subluxations. There was mild to moderate bony spurring, particularly at L3-4, but degenerative changes had not progressed significantly since x-rays taken in May 1978. Some facet joint arthritic changes were noted, particularly at the L4-5 and L5-S1 levels on the right side and L3-4 on the left side. There were sclerotic changes around the sacroiliac joints.
 
 
 23
 The ALJ found that plaintiff suffered from "degenerative disc and joint disease and controlled hypertension." The ALJ further found that the medical evidence did not support a finding that plaintiff had "such intense, debilitating pain, dizziness, and headaches that she is precluded from performing basic work activities." Finally, the ALJ found that plaintiff did not have a severe impairment because she did not "have any impairment or impairments which significantly limit her ability to perform basic work-related activities."
 
 
 24
 The ALJ's decision became the final decision of the Secretary when it was affirmed by the Appeals Council on December 14, 1984. On September 6, 1985, the district court issued an Opinion and Order affirming the findings of the Secretary and dismissing plaintiff's complaint. The instant appeal ensued.
 
 II.
 
 25
 Plaintiff argues that substantial evidence does not support the Secretary's finding that plaintiff does not suffer from a severe impairment. Under 42 U.S.C. Sec. 405(g), "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." Substantial evidence is " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "Substantiality of the evidence must be based upon the record taken as a whole" and " 'must take into account whatever in the record fairly detracts from its weight.' " Garner v. Heckler, 745 F.2d 383, 388 (6th Cir.1984) (quoting Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir.1978)).
 
 
 26
 The sequential disability evaluation procedure is broken down into a five-step inquiry. First, if the claimant is found to be engaged in substantial gainful activity, he will be found not disabled. Second, the claimant must be found to have a severe impairment. "[A]n impairment qualifies as non-severe only if, regardless of a claimant's age, education, or work experience, the impairment would not affect the claimant's ability to work." Salmi v. Secretary of Health and Human Services, 774 F.2d 685, 692 (6th Cir.1985); see also Farris v. Secretary of Health and Human Services, 773 F.2d 85, 89-90 (6th Cir.1985).
 
 
 27
 Plaintiff argues that the opinions and diagnoses of her treating and examining physicians provide overwhelming evidence that she suffers from an impairment which affects her ability to work. "The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.... This is true, however, only if the treating physician's opinion is based on sufficient medical data." Harris v. Heckler, 756 F.2d 431, 435 (6th Cir.1985) [citation omitted]. See King v. Heckler, 742 F.2d 968, 973 (6th Cir.1984). The opinions and diagnoses of physicians who have examined the claimant only once are entitled to less weight. Hephner v. Mathews, 574 F.2d 359, 362 (6th Cir.1978). Although the ultimate determination whether a claimant has a severe impairment is for the Secretary, uncontroverted medical opinions, if supported by sufficient medical data, may not be ignored. Carrillo Marin v. Secretary of Health and Human Services, 758 F.2d 14, 16 (1st Cir.1985).
 
 
 28
 The Secretary, rather than arguing that the opinions of Dr. Shaubel, Dr. Navarro, and Dr. McPeek are unsupported by clinical findings, argues that plaintiff's impairment does not affect her ability to work because examinations of plaintiff by these physicians revealed normal muscle strength, normal gait, normal sensor testing, and straight leg raising negative 60 to 95 degrees and because lumbar spine x-rays revealed no significant changes since 1978. The ALJ may not, however, credit only those portions of the medical evidence which it approves or substitute his own impression of the claimant's condition for uncontroverted medical opinion. See Carrillo Marin, 758 F.2d at 16; Hurst v. Secretary of Health and Human Services, 753 F.2d 517, 519-20 (6th Cir.1985). Dr. Navarro, Dr. Schaubel, and Dr. McPeek all agreed that plaintiff suffered from physical impairments which affected her ability to work.
 
 
 29
 The Secretary also argues that plaintiff's impairments were nonsevere because "the reports of Dr. Navarro concerning [plaintiff's] cervical spine and neck reflect a general improving condition with some relapses that certainly did not last twelve months or more" and because plaintiff's "shoulder problems had cleared up in 1984." The ALJ, however, made no determination whether plaintiff's impairment met the durational requirement. That determination is to be made only after a severe impairment has been found. Garner, 745 F.2d at 387. Moreover, the fact that plaintiff's condition had improved more than two years after she allegedly became disabled does not militate against a finding of severe impairment. See Garner, 745 F.2d at 390.
 
 
 30
 Given the uncontroverted medical evidence, this court cannot conclude that plaintiff's impairment could not affect her ability to work regardless of her age, education, and work experience. Thus, we hold that the ALJ's conclusion that plaintiff does not suffer from a severe impairment is not supported by substantial evidence. We conclude that plaintiff suffers from a severe impairment under the second step of the sequential evaluation process.
 
 III.
 
 31
 Accordingly, we REVERSE the district court's order and REMAND the case with instructions to the district court to remand the case to the Secretary for completion of the sequential evaluation process.