912 F.2d 465
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
George LUCAS, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 89-2108.
 United States Court of Appeals, Sixth Circuit.
 Aug. 29, 1990.
 
 Before KEITH and RALPH B. GUY, Jr., Circuit Judges, and ENSLEN, District Judge.*
 RALPH G. GUY, JR., Circuit Judge.
 
 
 1
 The claimant, George Lucas, appeals a district court judgment affirming the final decision of the Secretary of Health and Human Services (the Secretary) denying his application for Social Security disability insurance benefits. Finding substantial evidence on the record in support of the Secretary's decision that Lucas is not disabled within the meaning of the Social Security Act (the Act), 42 U.S.C. Sec. 401, et seq., we affirm.
 
 I.
 
 2
 Lucas filed an application with the Secretary for disability insurance benefits in April of 1984, claiming disability as of September 1970 due to a kidney transplant, hypertension, heart trouble, chest pains, arthritis, depression and alcoholism.[1] The Secretary denied the application initially and again upon reconsideration. At the plaintiff's request, an Administrative Law Judge (ALJ) returned his application to the Secretary for review under the revised rules governing disposition of claims alleging mental impairments mandated by the Social Security Disability Benefits Reform Act of 1984. Once again, the Secretary denied the application initially and upon reconsideration.
 
 
 3
 In April 1988, a hearing on Lucas' claim was held before an ALJ who subsequently found that Lucas possessed the residual functional capacity to perform a limited range of sedentary work and was therefore "not disabled" within the meaning of the Act. The claimant's request for review by the Appeals Council was denied, at which time the ALJ's decision became the final decision of the Secretary.
 
 
 4
 Lucas then filed this action in the United States District Court for the Eastern District of Michigan seeking judicial review of the Secretary's decision pursuant to 42 U.S.C. Sec. 405(g). The matter was referred to a magistrate for report and recommendation pursuant to 28 U.S.C. Sec. 636(b)(1)(B). Upon submission of cross-motions for summary judgment, the magistrate recommended that the Secretary's motion be granted, and the district court entered an order accordingly. Lucas then filed this appeal.
 
 II.
 A. The Administrative Hearing
 
 5
 The plaintiff was born in February 1947, and was 41 years old at the time of the administrative hearing. He was divorced, had no children, and was living in a basement apartment in his sister's home in Detroit, Michigan. Lucas explained that he had attended high school through the tenth or eleventh grade and could read and write competently. He recounted a variety of unskilled jobs held before 1970 with exertional levels ranging from light to very heavy. In 1970 Lucas became disabled due to renal disfunction, eventually resulting in the performance of a kidney transplant in 1974. He received Social Security disability insurance benefits for the period between 1970 and 1984. Although he has held various part-time jobs for short periods, including self-service gas station attendant in 1975 and supermarket bagger in 1986, Lucas has not engaged in substantial gainful activity within the meaning of the Act since 1970.[2] At the time of the hearing, Lucas was surviving on general assistance payments and food stamps.
 
 
 6
 Lucas explained to the ALJ that when he attempts to work for more than one day at a time he becomes "worn out mentally and physically" and frequently catches a cold. He stated that he has difficulty ambulating and is unable to walk for more than "[a] couple blocks" because his left hip "slip[s] out of the joint" when he does. He maintained that this hip condition had been present for approximately three to four years.
 
 
 7
 Lucas claimed that he would not engage in vigorous physical exertion or attempt to lift anything over 25 pounds because of his hip condition and because exercise causes his heart to pound and creates shortness of breath. He stated that he can walk up three flights of stairs, but must then rest because of heart pounding and dizziness.
 
 
 8
 Lucas apparently spends most of his time watching television. Except for attending church approximately twice per month, he engages in no organized activities. He has no hobbies and is not a member of any association. Lucas explained that he is unable to become involved in such activities because he has no money beyond what he needs to live.
 
 
 9
 When asked what he did for fun, Lucas responded that he gets drunk. He explained that he is drunk "all the time, when I'm not doing nothing else, when I'm watching--when I get drunk I'm watching TV. That's my biggest thing, that's all I do, get drunk and watch TV." Asked how he would spend $50, Lucas stated that he would purchase a pint of liquor and drink it all in one day. Lucas stated that he purchased alcohol with his general assistance payments, and that he would get drunk every day if he could afford to. Although Lucas claimed not to have used any "street drugs" since the 1970s, he was unable to explain the fact that a drug screen performed on him in 1982 revealed the presence of several drugs other than those given to him at the hospital.
 
 
 10
 The claimant indicated that he generally cares for many of his own personal needs. He stated that he is capable of driving a car, although he had not done so in several months. Lucas testified that he travels back and forth between Detroit and Port Huron every two to four months to spend time with a female friend. He buys his own food, prepares his own meals, and keeps his own apartment in order, as long as he is not depressed. He indicated that he suffers from profound depression, explaining "I'm alright when I'm not depressed,.... But I get depressed and I--I don't want to do nothing, I just don't do anything when I'm depressed." Lucas stated that his depression may be brought on by "any type of pressure" and described bouts of severe depression lasting three or four days from which he generally does not fully recover before the cycle repeats itself. He regards himself as "depressed all the time." Lucas explained that he began to experience this depression when his kidneys failed, but that the problem worsened when his Social Security disability payments were terminated in 1982.
 
 
 11
 During the hearing, the ALJ asked the claimant whether he felt able to perform "a simple job of sitting at a work bench, doing simple assembly, or maybe machine tending, or inspection work" that would not require any lifting. Lucas responded that he could not perform such work because he suffers from arthritis which causes cramping in his hands.
 
 
 12
 After questioning Lucas, the ALJ heard testimony from a vocational expert (VE) who was present during the claimant's testimony and had examined the medical reports on record. The ALJ posed the following hypothetical question to the VE:
 
 
 13
 Taking a gentleman such as Mr. Lucas here, considering his age, education, work experience. If we were to consider[ ] the presence of a hypertensive condition, which is controlled with medication, also that he is status post-kidney transplant several years duration, with a good renal function. He is status post-sub-total gastrectomy, with once again no residual. He is status post-meningitis, again with no residuals.
 
 
 14
 We have the presence of an affective disorder, and/or adjustment disorder with some depressive features, of a mild degree. We have the presence of some ethanolism, or alcoholism, with--without any significant impact on his activities of daily living. And if I were to add to the other restrictions ... a requirement that he be relegated to simple unskilled, non-complex types of tasks, would he be able to perform any of his past relevant work, sir?
 
 
 15
 The VE responded that Lucas could perform all his past relevant work. The ALJ then altered the hypothetical, changing the exertional limitation from light to sedentary. The VE stated that with this limitation Lucas could not perform any of his past relevant work, but that there were approximately 9,000 jobs in Detroit and 18,000 jobs in Michigan, including bench assembler, hand packager, and machine tender, that the claimant could perform. Finally, the ALJ asked the VE whether jobs would be available if he were "to assume all factors of the impairment as per the testimony" of the claimant "even if not reflected in the medical evidence of record." The VE responded that if the claimant's testimony were true, his constant fatigue and frequent and debilitating depression would prevent him from performing any type of gainful work. The claimant's attorney did not cross examine the VE.
 
 
 16
 B. The Decision of the Administrative Law Judge
 
 
 17
 The ALJ issued a nine-page decision fully addressing the medical evidence on record as well as the claimant's subjective complaints. In that decision, the ALJ found that Lucas was status post-kidney transplant, subtotal gastrectomy and meningitis, with no residuals and that he had hypertension, a depressive adjustment disorder, and ethanolism but that none of these impairments satisfied the requirements of an Appendix 1 Listing. See 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ then determined that Lucas' subjective complaints of impairment were not supported by the medical evidence on record. He found that although the claimant was unable to perform any past relevant work, all of which required an exertional level of light or higher, he could perform a full range of unskilled sedentary work. Using Grid Rule 201.24, 20 C.F.R. Pt. 404, Subpt. P, Sec. 201.24 as a framework for his decision, the ALJ concluded that Lucas was not disabled within the meaning of the Act.
 
 III.
 
 18
 We review the Secretary's final decision for compliance with the Social Security Act and the regulations issued pursuant to it, and to determine whether substantial evidence exists on the record to support each necessary finding. 42 U.S.C. Sec. 405(g); Blankenship v. Bowen, 874 F.2d 1116, 1120-21 (6th Cir.1989); McCormick v. Secretary of Health & Human Services, 861 F.2d 998, 1001 (6th Cir.1988). The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantiality is determined by a canvass of the record as a whole; " '[w]e may not focus and base our decision entirely on a single piece of evidence, and disregard other pertinent evidence.' " Garner v. Heckler, 745 F.2d 383, 387 (6th Cir.1984) (quoting Hephner v. Mathews, 574 F.2d 359, 362 (6th Cir.1978)). Where the Secretary's determination is supported by substantial evidence it must stand, regardless of whether this court would resolve the factual issues differently if approaching them de novo. Maziarz v. Secretary of Health & Human Services, 837 F.2d 240, 243 (6th Cir.1987).
 
 
 19
 Social Security disability insurance benefits are available only to those who can establish that they are disabled within the terms of the Social Security Act. 42 U.S.C. Sec. 423(a)(1)(D). The Act defines "disability" as the inability to engage in
 
 
 20
 any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.
 
 
 21
 42 U.S.C. Sec. 423(d)(1)(A).
 
 
 22
 Congress has delineated four factors that the Secretary must consider in determining whether a claimant is capable of performing substantial gainful activity: the individual's age, education, job experience, and functional capacity to work. See 42 U.S.C. Sec. 423(d)(2)(B).
 
 
 23
 The regulations promulgated by the Secretary to administer payment of benefits require a five-step sequential process to be followed in evaluating all claims of mental or physical disability. 20 C.F.R. Secs. 404.1520, 404.1520a; see generally Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). As a threshold matter, the claimant must establish that he is not engaged in substantial gainful activity at the time he seeks benefits. 20 C.F.R. Sec. 404.1520(b). This being done, he must show that he has a "severe impairment"; that is, an impairment or combination of impairments which "significantly limits ... physical or mental ability to do basic work activities." 20 C.F.R. Sec. 404.1520(c); see Farris v. Secretary of Health & Human Services, 773 F.2d 85, 89-90 (6th Cir.1985); see generally Bowen v. Yuckert, 482 U.S. 137. In order to meet this burden, the claimant must come forward with
 
 
 24
 medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged....
 
 
 25
 42 U.S.C. Sec. 423(d)(5)(A); see also Duncan v. Secretary of Health & Human Services, 801 F.2d 847 (6th Cir.1986).[3] Accordingly, a claimant's "statements alone are not enough to establish that there is a physical or mental impairment," at this or any other stage of the evaluation process, 20 C.F.R. Sec. 404.1528. A claimant who has been determined to suffer from a severe impairment proceeds to the third step of the process in which the Secretary must determine whether the medical evidence alone establishes the claimant's inability to engage in substantial gainful activity. The claimant's impairment is matched against the specific medical disorders listed in Appendix 1 of the Secretary's regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. An individual who can show that he suffers from a listed impairment, or its medical equivalent, will be found disabled regardless of his age, education, or work experience. 20 C.F.R. Sec. 404.1520(d); Gambill v. Bowen, 823 F.2d 1009, 1011 (6th Cir.1987).
 
 
 26
 A claimant who does not suffer from a listed impairment may nevertheless be found disabled if he suffers from a severe impairment that prevents him from performing substantial gainful activity. 42 U.S.C. Sec. 423(d). To do so, the claimant must prove that his disability prevents him from performing any substantial gainful activity that he has carried out within fifteen years prior to the filing of his claim for benefits. 20 C.F.R. Sec. 404.1565(a). Where the claimant has carried this burden at the fourth step, the fifth and final step in the procedure requires the Secretary to demonstrate that, notwithstanding his impairment, the claimant has the residual functional capacity to perform specific jobs existing in the national economy. Cole v. Secretary of Health & Human Services, 820 F.2d 768, 771 (6th Cir.1987); Richardson v. Secretary of Health & Human Services, 735 F.2d 962, 964 (6th Cir.1984).
 
 
 27
 Where the claimant's severe impairment limits only his strength, the Secretary can satisfy his burden without considering direct evidence of the availability of jobs the particular claimant can perform through reference to the Medical-Vocational Guidelines (the grid) found in Appendix 2 of the Regulations. 20 C.F.R. Pt. 404, Subpt. P, Appendix 2.[4] Because the grid takes account only of a claimant's "exertional" impairment, that is "an impairment which manifests itself by limitations in meeting the strength requirements of jobs," 20 C.F.R. Pt. 400, Subpt. P, App. 2, Sec. 200.00(e), where a claimant suffers from an impairment that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, the grid may be employed only as a "framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations." 20 C.F.R. Pt. 400, Subpt. P, App. 2, Sec. 200.00(e)(2); Cole, 820 F.2d at 772.
 
 IV.
 
 28
 After a thorough review of the medical evidence, we find that substantial evidence supports the ALJ's determination that the Secretary satisfied his burden at the fourth level of disability determination and that Lucas is therefore not disabled within the meaning of the Act. We begin with an examination of the medical evidence offered in support of Lucas' symptoms of physical disability.
 
 A. Physical Impairments
 
 29
 Lucas was hospitalized in October of 1970 and diagnosed as having nephrotic syndrome. After treatment with steroids and Imuron failed to improve his condition, he began hemodialysis in March 1973 and underwent a kidney transplant later that year. The transplant was rejected within one week and Lucas was returned to hemodialysis until a successful kidney transplant was performed in 1974.
 
 
 30
 All the evidence on record points to the conclusion reached by the claimant's attending physician, Dr. Shapiro, in November of 1986:
 
 
 31
 This patient has a normally functioning renal transplant 12 years after surgery with a serum creatinine which is well within the normal range. He has no disability at this time related to his renal disease.
 
 
 32
 In a June 1984 examination, Dr. Ernest Bedia reported that the claimant's second kidney transplant was continuing to function well with normal serum creatinine and that Lucas showed "no signs of kidney failure." Dr. Bedia explained that Lucas did have hypertension due to his kidney disfunction but that it had been controlled with medication. Dr. Abraham Becker, who examined Lucas in November of 1984, reported that "the kidney transplant has been successful and working well.... Likewise the essential hypertension is well controlled." See also report of Dr. M.C. Wood ("hypertension is well controlled").
 
 
 33
 Lucas developed a bleeding ulcer 24 hours after the second kidney transplant, necessitating a partial gastrectomy which required him to stay in the hospital for several months. There is no evidence that Lucas is presently impaired in any way as a result of his post-gastrectomy status. In fact, in a September 1982 examination Dr. Shapiro found that Lucas' peptic ulcer disease was "clinically stable."
 
 
 34
 While the claimant reported having a heart attack in 1975, and has complained of chest pain and shortness of breath upon exertion, he has produced no medical records to substantiate these symptoms. A thorough chest, lung, heart, musculoskeletal, and neurological examination, conducted by Dr. M.C. Wood in August of 1982, yielded results within normal limits. A chest x-ray was negative and serum creatinine was recorded as normal. Dr. Wood noted that Lucas' allegations of chest pain were not of "cardiac origin or angina pectoris." Dr. Bedia's report reached an identical conclusion ("no sign" of congestive heart failure or angina).
 
 
 35
 Dr. Becker, who examined Lucas in November of 1984, noted a cyst in Lucas' left lung, but stated that it was asymptomatic and reported that Lucas had "no definite shortness of breath and no major restrictions of his pulmonary function." Becker noted that all other bodily functions were normal.
 
 
 36
 Lucas reported to Dr. Bedia in 1984 that he got bronchitis almost every year. Bedia noted that since a period of hospitalization in 1982 for bronchopneumonia, Lucas "has never had any chest pain ever since." Additionally, Bedia reported that Lucas experienced "[n]o shortness of breath on exertion and he can walk 2 miles." After noting some "joint pain," Dr. Bedia wrote that Lucas "does not take pain medication," and that he "denies any other illnesses."
 
 
 37
 Several of the medical reports contained in the record note that Lucas has been on immunosuppressive therapy since his second transplant, and that these drugs may be responsible for his periodic bouts with bronchitis and pneumonia as well as his 1986 hospitalization for meningitis. There is no evidence, however, that Lucas is presently unable to work because to do so while on immunosuppressive therapy would place him at an unacceptable risk of contracting an infectious disease.
 
 
 38
 As noted above, the reason Lucas gave the ALJ for his inability to perform a sedentary job requiring simple manipulation was that his hands cramped due to arthritis. The only example he gave of this phenomenon was severe cramping that occurred in 1970 when he was driving a truck for his brother's sanitation company. The significance of this example would appear to be tempered by the passage of time and the fact that the claimant has driven a car since then. In any case, as no medical evidence has been presented in support of this symptom, it cannot form the basis of a finding of disability.[5]
 
 
 39
 Lucas' contention that he is unable to perform sedentary work due to pain in his hip preventing him from walking for more than one block is also contradicted by substantial evidence on the record. Dr. Wood reported that sometime in 1981 the claimant had developed pain in the left hip for which he was admitted to the hospital. Lucas informed Wood that he was unable to put pressure on the hip. Dr. Wood ruled out steroid induced osteosporosis of the left hip, and remarked that "[r]ecently, he developed pain of the left hip, which may be related to steroid therapy," but found that "the motion of the left hip is very well maintained."
 
 
 40
 In November 1982, Dr. Shapiro wrote that, in response to the claimant's complaints of pain in his left hip, a "sulphur colloid hip necrosis study was done to rule out hip necrosis. This was negative." The ALJ and several of the physicians who have met with Lucas have noted that his gait was stable and that he displayed no pain in walking. Of particular note is an examination performed by Dr. Irene Macko in February of 1987. Dr. Macko noted that Lucas claimed chest pain "which is precipitated by walking one and one-half miles, climbing 2 flights of stairs, rushing, or doing yard work." Dr. Macko's report, indicating that Lucas is able to walk one-and-one half miles, would appear to contradict the claimant's contention, approximately one year later, that for the past three or four years he had been unable to walk for more than one block because of pain in his hip. In any event, Lucas has failed to provide any medical evidence of a disabling hip disorder.
 
 
 41
 Based on the medical reports discussed above, we find substantial evidence in support of the ALJ's determination that the claimant is not precluded from performing sedentary work by his physical disabilities.
 
 B. Mental Impairments
 
 42
 Lucas argues that the ALJ improperly disposed of his mental impairments as "not severe" at the second stage of the disability determination process. The government responds that the Secretary did not in fact discard Lucas' allegations of mental impairment at the second stage. Upon review of the record, we agree with the claimant that the ALJ did find his mental impairments not severe;[6] nevertheless, we find substantial evidence on the record to support the ALJ's determination that the claimant's mental impairments did not "significantly limit" his "ability to do basic work activities," 20 C.F.R. Sec. 404.1520(c), and thus were not "severe" within the meaning of the Act.
 
 
 43
 The regulations define the "basic work activities" referred to in 20 C.F.R. Sec. 404.1520(c) as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. Sec. 404.1521(b). Such aptitudes include such mental capacities as "[u]nderstanding, carrying out, and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting." 20 C.F.R. Sec. 404.1521(b). See also, Yuckert, 482 U.S. at 137. As discussed below, the record contains substantial evidence that Lucas was fully capable of performing such basic work activities, and therefore supports the Secretary's finding that Lucas' mental impairments were not "severe."
 
 
 44
 As required by 20 C.F.R. Sec. 1520a(b), the ALJ appended a psychiatric review technique form to his decision in which he evaluated the claimant on a five-point scale in the four areas specified in the regulation. On the form, the ALJ indicated the presence of an adjustment disorder with depressive features, see 20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 12.04, and alcoholism, see 20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 12.09. The ALJ then rated the degree of functional loss resulting from the impairments on a scale "that ranges from no limitation to a level of severity which is incompatible with the ability to perform those work-related functions." 20 C.F.R. Sec. 1520a(b)(3). The ALJ determined that Lucas' mental impairments, in combination, imposed a "slight" "restriction of activities of daily living," created "slight" "difficulty in maintaining social functioning," "seldom" created "deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner," and "never" caused "episodes of deterioration or decompensation in work or work-like settings." 20 C.F.R. Sec. 1520a(b)(3). Each determination is supported by substantial evidence.
 
 
 45
 With regard to the claimant's alleged alcoholism, we note that the evidence in support of addiction is sparse. Lucas informed the ALJ that he drank "all the time." In February 1987, he told Dr. Macko that he "consumed 2 quarts of beer or a fifth of liquor per day since age 18." In an interview conducted with the claimant's sister in November 1986, she stated that when the claimant drinks, he will drink one half pint during a night, and that when he cannot drink he becomes irritable. Finally, Lucas informed a psychiatrist in 1986 that he drank at least a pint per day and had been doing so since 1982.
 
 
 46
 In 1982, however, Dr. Wood reported that Lucas "drinks socially." During a May 1983 hospital stay, Dr. Shapiro noted that Lucas "occasionally drinks," but that he "denies excess alcohol." When Dr. Bedia saw Lucas in 1984, she noted that the claimant drinks one pint of whisky per week. Dr. Becker noted in November of 1984 that Lucas "drinks alcoholic beverages rarely."
 
 
 47
 During a 1986 hospital stay, claimant's attending physician, Dr. Lerner, noted: "half pack per day smoking and occasional ethanol intake." When questioned shortly before the hearing, Dr. Shapiro wrote that he had "no information that [Lucas] has abused illicit drugs or alcohol in the past."
 
 
 48
 In fact, in her first interview with the Michigan Disability Determination Department, the claimant's sister was recorded as stating that Lucas "will have a couple beers every two or three months, does not misuse alcohol." Accordingly, there is substantial evidence to support the conclusion that the claimant's intake of alcohol was so low as to have only a minimal impact on his daily life.
 
 
 49
 The medical evidence of Lucas' depression is contained in a report prepared by Dr. Charles O. Brosius after he interviewed the claimant in January of 1985 on referral from the Michigan Department of Disability Determination. Brosius noted that the claimant was taking .5mg of Sinequan daily for depression. Lucas told Brosius that he "gets along fine with his friends when he has money but they ignore him when he doesn't." Dr. Brosius found Lucas to be "correctly oriented for time, place and person. He seemed pleasant, cooperative, I did not detect an odor of alcohol on his breath and he seemed to walk with a steady gait, and without assistance." Brosius noted that Lucas' "[s]tream of mental activity was spontaneous but sometimes vague, odd, his pressure of speech was slowed, circumstantial and poorly organized." Lucas "denied hallucinations recently but says in the past he had experienced hearing voices ... on two occasions he claims that they urged him to cut his wrists and on another occasion they urged him to take an overdose of medication." Brosius stated that he "could not uncover a delusional system nor did I find evidence of paranoid thinking or ideas of reference." With regard to emotional reaction, Lucas "appeared to be depressed, anxious, at times fearful and his affect was flattened." On memory tests, Lucas "was able to repeat three digits forward and one backward." He was not able to recall any of three objects after three minutes had elapsed. Lucas named four of the last six presidents correctly, and correctly named five large cities. He was unable to count backwards from 100 by sevens. Lucas was able to explain the meaning of one of two proverbs and the differences between a bush and a tree. When asked what he would do if he discovered a fire in a theatre, he stated that he would leave by the closest exit, and stated that if he found an addressed envelope he would open it and look for money.
 
 
 50
 Based entirely on this information and Lucas' medical records, Dr. Brosius diagnosed, inter alia, "1. Chronic organic brain damage associated with mild amnesia and symptoms of mental depression. 2. History of chronic alcoholism." Brosius also indicated that Lucas was incapable of handling his insurance benefit funds. The ALJ rejected Brosius' findings, explaining that the doctor's report "gave little, if any, clinical findings to support such a diagnosis."
 
 
 51
 Approximately one year later, Lucas saw Dr. Gordon Forrer. Forrer found the claimant to possess "the energy and vigor associated with men in his age group. He was pleasant, agreeable, friendly, and affable and there was a shared, empathetic, smiling response occasionally." Forrer found that Lucas communicated well, was "satisfactorily articulate," was "always appropriately responsive to inquiry and neither rambling nor circumstantiality were present." Lucas' "thought-association pathways were well organized and there was no constriction nor any impoverishment. His mood was one of held apathy/depression without irritability, hostility...." Lucas described himself as "depressed about 'everything.' " Lucas told Dr. Forrer that he "performs all the usual household chores, ... [and] does all of his own shopping."
 
 
 52
 Forrer found Lucas "oriented for time, place, and person," without any confusion or clouding of consciousness, and "of average intellectual endowment." On tests of his memory, Lucas could recall a four-digit number. He could distinguish between objects, stated that he would mail a found letter, made only two mistakes in counting backwards from 100 by sevens, and correctly identified the meaning of several proverbs.
 
 
 53
 Forrer found that Lucas was "very mildly depressed at the present time." He found that "[t]here was a history of suicidal fantasies 'a couple of years ago' via overdose," but that he "denied feeling suicidal at the present time."
 
 
 54
 Forrer concluded that Lucas "can look after his own personal needs without difficulty and handle his own funds quite adequately." His only diagnosis was "Adjustment disorder with depressed mood." Forrer concluded his report as follows:
 
 
 55
 From the functional point of view, this man reflects no daily activities impairment. There is nothing more than a mild social function impairment. There is no evidence of any deficiencies of concentration or persistence resulting in frequent completional failures, nor is there any indication of failure in a work or a worklike situation.
 
 
 56
 The remainder of the medical reports presented to the ALJ support Dr. Forrer's diagnosis. We note first that, as of the time of the hearing, Lucas was not undergoing any psychological treatment. Dr. Shapiro reported that he was "not aware of this patient being pathologically depressed," and stated that "to my knowledge he is mentally competent." While Lucas was hospitalized in 1986 he saw a psychiatrist, Dr. B. Connally, who reported that although Lucas acknowledged "periodic bouts of discouragement," he "doesn't think he is 'depressed.' " In 1987, Dr. Macko reported that Lucas had a history of depression but indicated that it "was relieved with Sinequan in the past."
 
 
 57
 The anecdotal evidence developed at the hearing and through interviews with the claimant's sister indicates that Lucas is able to carry on a normal daily routine without assistance. He takes his medication and cares for his person without reminder. He is friendly and has no trouble getting along with others, although he is shy and has few close friends. Lucas is nervous in crowds, but still able to do his own shopping. With the possible exception of Dr. Brosius, all those who have interviewed the claimant have found him to be of average intelligence and his testimony to be "lucid with no deficits of concentration, attention, or memory."
 
 
 58
 While the claimant and his sister have presented some evidence that his depression substantially affects his daily life, we find that the ALJ's decision to credit Forrer's diagnosis over Brosius' to be supported by substantial evidence on the record.
 
 
 59
 Lucas correctly points to our decision in Farris v. Secretary of Health & Human Services, 773 F.2d 85 (6th Cir.1985), in which we held that:
 
 
 60
 [I]n order to ensure consistency with statutory disability standards, an impairment can be considered as not severe, and the application rejected at the second stage of the sequential evaluation process, only if the impairment is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience."
 
 
 61
 Id. at 89-90 (quoting Brady v. Heckler, 724 F.2d 914, 920 (11th Cir.1984). While the standard is a strict one, we find that the medical evidence supports the ALJ's determination that Lucas' mental impairments, when taken together, are not "severe" within the meaning of the Act.
 
 
 62
 The ALJ correctly did not abandon consideration of the claimant's mental condition throughout the remaining steps of the disability determination. 42 U.S.C. Sec. 423(d)(2)(C). As explained above, he employed the grid only as a framework for his decision and relied on the testimony of a VE who was fully informed of the nature and severity of the claimant's mental as well as physical disabilities.
 
 
 63
 Accordingly, we find that the medical evidence on record supports the Secretary's final decision that Lucas is not disabled within the meaning of the Act. The decision of the district court is AFFIRMED.
 
 
 
 *
 The Honorable Richard A. Enslen, United States District Court for the Western District of Michigan, sitting by designation
 
 
 [1]
 Lucas previously had been awarded a period of disability from September 1970 through December 1982
 
 
 [2]
 In 1975 Lucas attended a vocational rehabilitation class in welding, though he did not complete the course. From 1967 until 1970, Lucas worked as a parts assembler and wet sander at an automotive plant. In the summer of 1970, he worked as a laborer for the Detroit Parks and Recreation Department. For approximately five years, ending in 1970, Lucas worked part time for his brother's sanitation service, picking up garbage and driving a truck
 
 
 [3]
 The Secretary's regulations provide:
 If you have a physical or mental impairment, you may have symptoms (like pain, shortness of breath, weakness or nervousness). We consider all your symptoms, including pain, and the extent to which signs and laboratory findings confirm these symptoms. The effects of all symptoms, including severe and prolonged pain, must be evaluated on the basis of a medically determinable impairment which can be shown to be the cause of the symptom. We will never find that you are disabled based on your symptoms, including pain, unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce those symptoms.
 
 
 [20]
 C.F.R. Sec. 404.1529
 
 
 [4]
 The Appendix 2 guidelines aid the Secretary in determining disability claims by allowing "administrative notice" to be taken of the existence of jobs in the national economy that those with particular combinations of the four statutory factors are capable of performing. Kirk v. Secretary of Health & Human Services, 667 F.2d 524, 529 (6th Cir.1981)
 
 
 [5]
 Lucas stated that he had seen a doctor about the arthritic condition but that the doctor could not explain the source of the problem
 
 
 [6]
 We gather as much from the fact that the ALJ did not explicitly analyze either alleged impairment to determine whether it fell within an Appendix 1 Listing, nor did he follow the procedure set out in 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00A for determining the residual functional capacity of those with severe mental impairments. See also, 20 C.F.R. Sec. 404.1520a