2 F.3d 1151
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
George E. ROSE, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 92-3908.
 United States Court of Appeals, Sixth Circuit.
 July 29, 1993.
 
 Before MERRITT, Chief Judge, and GUY and BATCHELDER, Circuit Judges.
 PER CURIAM.
 
 
 1
 Appellant George Rose filed an application for disability benefits under the Social Security Act on September 24, 1987, alleging disability since 1983. His application was denied initially and upon reconsideration. On July 25, 1990, a hearing was held before an Administrative Law Judge, who received medical records into evidence and took testimony from Rose, Rose's son, a friend of Rose's, and a doctor called by the ALJ. On December 27, 1990, the ALJ issued a written opinion denying benefits because Rose could do his past relevant work as a janitor. The Appeals Council declined to review Rose's case. Rose then sought review in the district court, which granted the Secretary's motion for summary judgment, finding that substantial evidence supported the ALJ's decision. Rose filed a timely appeal with this court. We hold that the ALJ's finding that Rose could perform his past relevant work is not supported by substantial evidence. We therefore reverse the summary judgment entered by the district court in favor of the Secretary, and remand this case to the ALJ for further consideration.
 
 
 2
 * George Rose was born in 1937. From 1972 to 1983, Rose was a push-car repairman for the Norfolk & Western Railway. Prior to 1972, Rose held various jobs as a mechanic or machine operator. He worked as a mold operator for a tire recapping company, as a gas station attendant and car mechanic, as a machine attendant for General Electric, and as a machine attendant and case packer for Scott Paper. All of Rose's previous jobs required him to lift or carry more than 50 pounds.[1]
 
 
 3
 In October 1983, Rose left his job with the railroad because he was having problems with dizziness, headaches, and passing out. He has not returned to that or any other job since.
 
 
 4
 Rose testified that he passes out as much as once a week, with each incident ranging in duration from a few minutes to twenty hours. Rose also has dizziness, which occurs with frequency and often precedes the blackout spells. The dizziness is sometimes brought on by temperature extremes, such as when it is 85 or 90 degrees in the summer.
 
 
 5
 Rose suffered a myocardial infarction in August of 1989. He recovered well, but continues to take nitroglycerin for recurring chest pains.
 
 
 6
 Rose also experiences depression. His house burned down, his daughter and granddaughter were killed by a drunk driver, and he is frustrated that he cannot go back to work or do much of anything.
 
 
 7
 Rose's daily activities are limited. Although he is able to cook, clean, drive a car, play cards, and use a riding mower to mow his lawn, his son does most of the cooking, cleaning, and laundry, a friend of Rose's takes him to the grocery store, and Rose's son often has to finish mowing the lawn for him.
 
 
 8
 Rose's son, Andrew, age 19, testified that his father's dizziness and shortness of breath had greatly reduced his activities. Andrew had witnessed at least two of his father's blackouts. During each of these, his father was unconscious for five to fifteen minutes. Andrew did not call the ambulance during either of these spells because it did not strike him as a serious matter.
 
 
 9
 Rose's friend, Charlene Mohr, testified that Rose's daily activities are limited by his shortness of breath, dizziness, and blackout spells. Although Mohr had not been with Rose when he blacked out, she testified that he has to stop and rest when doing most activities. She also testified that Rose used to do lots of things that he cannot do any more, like going dancing and doing other activities with Parents without Partners.
 
 
 10
 Rose's treating physician, Dr. Thomas Eaton, began seeing Rose in the late 1960s. Recently, Rose had visited Dr. Eaton about once a month. Many of Dr. Eaton's records were admitted as evidence at the hearing. Dr. Eaton found that Rose had vascular disease, sinusitis, colitis, and prostatitis. On more than one occasion, Dr. Eaton concluded that Rose's condition rendered him permanently unable to work or at least made the date upon which Rose could return to work indeterminable. It is not clear from Dr. Eaton's records which of Rose's ailments made him permanently unable to work.
 
 
 11
 Dr. Joel Steinberg was called by the ALJ as a medical advisor. Dr. Steinberg reviewed the medical evidence and listened to Rose's testimony at the hearing. Pertinent parts of Steinberg's testimony are as follows:
 
 
 12
 ALJ: Has Dr. Eaton in any way evaluated [Rose's] exertional capacity since he's been discharged from the hospital?
 
 
 13
 Dr. Steinberg: Well, he may have but if he did it's not provided to me. And the answer is--
 
 
 14
 ALJ: So, are you saying to me then that you don't know what kind of exertional limitations or exertional tolerances he has?
 
 
 15
 Dr. Steinberg: No, I think the presumption would be, without any facts, that [Rose] would have a medium type capacity without temperature extremes. To give you more specific limitations than that I would need additional information.
 
 
 16
 ...
 
 
 17
 ALJ: Do you find the existence, doctor, of any conditions that would significantly interfere with a person's ability to perform work activities?
 
 
 18
 Dr. Steinberg: Yes.
 
 
 19
 ALJ: And what are those conditions?
 
 
 20
 Dr. Steinberg: Well, the most important one is his myocardial infarction. He does have coronary artery disease--
 
 
 21
 ALJ: You don't know what his exertional tolerance is?
 
 
 22
 Dr. Steinberg: Well, the presumption, without other facts, is that he has a medium capacity without temperature extremes and that would be true from August of '89.
 
 
 23
 ALJ: All right, any other limitations?
 
 
 24
 Dr. Steinberg: Several others. The history of unconscious episodes regardless of their cause, would suggest an exclusion from dangerous environments and his tendency to become symptomatic, I think, somatically symptomatic, would suggest no greater than average stress.
 
 
 25
 At the end of the hearing, the ALJ concluded that he needed more information about Rose's exertional limitations and specifically asked Rose's counsel to get a copy of a stress test that Rose had mentioned doing. The ALJ needed more information on Rose's exertional limitations apparently because he disbelieved Rose's testimony about his blackout spells. When Rose's counsel cross-examined Dr. Steinberg about the work abilities of a person with regular blackout incidents, the ALJ cut Rose's counsel short:
 
 
 26
 Ms. Goshien, let me make this easy for you. If I accept as credible [Rose's] testimony about frequently passing out, I assure you there is no job he could do, I don't care what it is. The question is the reliability, the credibility of a person who continues to drive a car, works on his house tearing plaster off the wall, no good, no real good witnessing of the condition. That's, but if I were to agree with the factual aspect of your question, you don't even have to ask the doctor, I would find him disabled. A person cannot work if he passes out on a job with frequency. I'll make that as an absolute statement of fact.
 
 
 27
 The records received by the ALJ after the hearing were mostly duplicates of already admitted medical reports. For some reason, the stress test results were not provided to the ALJ.
 
 
 28
 On December 27, 1990, the ALJ issued a written opinion denying Rose disability benefits. The ALJ analyzed the case using the five-step procedure required by the regulations. First, the ALJ found that Rose was not engaging in substantial gainful employment. Second, Rose did have "severe impairments" under the regulations. Third, the severe impairments did not meet any of the "listings." Fourth, the ALJ confronted the question of whether Rose could perform his past relevant work. On the issue of past relevant work, the ALJ first determined Rose's residual functional capacity:
 
 
 29
 [T]he claimant's impairments, in combination, limit him to the performance of medium work activity that does not involve high stress or exposure to temperature extremes. The undersigned further concludes that as a safety measure due to the claimant's history of syncopal episodes, the claimant should not work in a dangerous environment.
 
 
 30
 The ALJ then made the following finding with regard to Rose's ability to perform his past relevant work:
 
 
 31
 The claimant's past relevant work as a janitor was performed indoors in a non-dangerous environment. Janitorial work involves no more than average stress and exertionally does not require more than medium work. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. (20 CFR 416.967(c)). Therefore, the claimant has the residual functional capacity to do his past relevant work as a janitor. "Claimant's description of his past relevant work at the hearing and in Exhibit 8 is consistent with medium exertional work."
 
 
 32
 (quotes in original.) Relying on 20 C.F.R. Sec. 416.920(e), the ALJ concluded that Rose was not entitled to disability benefits because he could perform his past relevant work. By doing so, the ALJ implicitly rejected as incredible Rose's allegations that he blacked out regularly.
 
 II
 
 33
 Under 42 U.S.C. Sec. 405(g), the ALJ's findings of fact are conclusive if supported by substantial evidence. " 'Substantial evidence' means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Kirk v. Secretary of Health and Human Servs., 667 F.2d 524, 535 (6th Cir.1981) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)), cert. denied, 461 U.S. 957 (1983).
 
 
 34
 The crucial issue in this case is whether substantial evidence supports the ALJ's finding that Rose could perform his past relevant work, for if not, the ALJ was required to conduct further analysis.
 
 
 35
 The ALJ found Rose's past relevant work to be as a janitor, but Rose never listed "janitor" as one of his past jobs either in his testimony or his written submissions to the Secretary. The record contains only two references to Rose's serving as a janitor at any point in his life. First, in a disability assessment completed by an examining psychologist, the psychologist wrote, "[Rose's] employment consisted of semiskilled work. He worked for 11 years as janitor and repairman with the N & W Railroad...." This information was apparently given by Rose in the course of his examination and was recorded by the doctor. The second reference to work as a janitor is in one of the questions the ALJ asked Rose at the hearing: "From what I could see here in the record your past work consisted of janitorial and factory work?" Rose answered, "And mechanics, yes."
 
 
 36
 Neither of these references is substantial evidence to support a finding that Rose's past relevant work was as a janitor. First, if we assume the psychologist's record of Rose's statement is correct, the report could mean one of three things: (1) that Rose held two different jobs at N & W Railway, a position as a janitor and a position as a repairman, (2) that Rose had some janitorial duties as part of his job as a repairman, or (3) that Rose had some repair duties as part of his job as a janitor. Read in light of the other evidence, the second description seems correct. Rose listed his job with the Railway as a "Push Car Repairman" and in his description of his duties, he referred to many maintenance-type tasks and no janitorial-type tasks. Second, Rose's answer to the ALJ at the hearing ("And mechanics, yes") was obviously intended to modify, if not correct an error in, the ALJ's description of his past work. It cannot be said that Rose's past relevant work was as a janitor based on these two references in the record.[2]
 
 
 37
 We must still uphold the ALJ's decision, however, if Rose's past relevant work fit within his residual functional capacity, which was determined by the ALJ to be medium work with no more than average stress, no exposure to temperature extremes, and no dangerous environments. Rose's job as a push-car repairman is his primary "past relevant work," for this is the job he held for most of the fifteen years preceding the date of onset of his claimed disability.[3] But based on Rose's testimony and the documentary evidence before the ALJ, none of Rose's past jobs would fit within his residual functional capacity.
 
 
 38
 The ALJ's statement, " 'Claimant's description of his past relevant work at the hearing and in Exhibit 8 is consistent with medium exertional work,' " is incorrect in light of the definition of medium work.[4] First, Rose's testimony at the hearing was that all of his past jobs have required him to lift or carry more than fifty pounds. This exceeds the limits of medium work. Second, in Exhibit 8, the disability report completed by Rose at the Secretary's request, Rose described his work with the railroad: "I had to lift axles, wheels, parts, boxes, etc., and carry them 100 yards or so sometimes." In response to the form's question asking Rose to describe what items he had to lift and carry, Rose wrote, "Axles, Boxes, Iron, Parts, I loaded and unloaded push cars, box cars, flat cars, etc." When the form asked Rose to check a box for "Heaviest weight lifted," Rose checked "50 lbs." from among the options "10 lbs.," "20 lbs.," "50 lbs.," "100 lbs.," and "Over 100 lbs." When the form asked Rose to check a box for "Weight frequently lifted/carried," Rose checked "Up to 25 lbs." from among the options "Up to 10 lbs.," "Up to 25 lbs.," "Up to 50 lbs.," and "Over 50 lbs." While the latter of these checked boxes is consistent with medium work, the former technically is not, because medium work involves lifting up to fifty pounds, not lifting fifty pounds. This point may seem nit-picky, but when read with the description of what Rose was required to lift and carry (axles, wheels, iron, etc.), it seems that Rose must have been conservative in his estimate when checking the appropriate boxes.[5] In addition, this interpretation is required by Rose's testimony at the hearing that he had to lift over fifty pounds at each of his earlier jobs. Rose's past relevant work with the railroad does not fit within the plain definition medium work.
 
 
 39
 Considering the ALJ's conclusion as to Rose's residual functional capacity, it is obvious that none of Rose's past work fits within that capacity. Presumably, Rose's job on the railroad was mainly outdoors and not in an air-conditioned office, so he could not perform this work without violating the temperature-extremes restriction on his work. Additionally, all of his prior work experience involved machinery, tools, and heavy equipment. These conditions would seem to violate the dangerous-environment restriction that is a part of Rose's residual functional capacity. The ALJ's conclusion that Rose's past relevant work fit within his residual functional capacity is not supported by substantial evidence.
 
 
 40
 In its supplemental letter to this panel, the government raised two arguments that need to be addressed briefly. First, the government argued that Rose had conceded that his past relevant work included that of a janitor. While we agree that Rose has said his past relevant work included janitorial duties, for the reasons discussed above we cannot agree that he conceded that his past relevant work was as a janitor. Second, the government asserts that Rose's failure to raise this precise issue waives it on appeal and that we should not disturb the decision of the ALJ on this ground. It is true that we generally will not consider issues raised for the first time on appeal. But because Rose has challenged the sufficiency of the evidence generally and because there is plain error in the ALJ's finding as to Rose's past relevant work, we conclude that it is appropriate for us to base our decision on the resolution of this issue. See Croston v. Secretary of Health and Human Servs., 729 F.2d 1460 (6th Cir.1984).
 
 III
 
 41
 For the foregoing reasons, the decision of the district court granting summary judgment for the Secretary is REVERSED and this case REMANDED with instructions to return this matter to the ALJ for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 Rose testified as follows:
 ALJ: Which is the easiest job you've had over the years? The job that required the least exertional effort, the least amount of lifting and carrying, for example? Least amount of bending?
 Rose: I really haven't had any kind of job like that. Everything I've always had has always been mechanical.
 ALJ: Did every job you had require you to lift or carry fifty pounds or more?
 Rose: Yes.
 
 
 [2]
 In response to a request of this panel, each party submitted a supplemental letter on the issue of whether the record supports a finding that Rose's past work was as a janitor. We learned from Rose's supplemental letter that he had some janitorial duties as part of his job with N & W Railway. His job as a push car repairman involved building and repairing push cars, loading and unloading heavy machinery, and working behind the parts counter, but when a laborer was out of town or on vacation, Rose would do the janitorial work that needed to be done. From this it is clear that description (2) above is the accurate statement regarding Rose's past work as a janitor. However, this information was not part of the record before the ALJ, so we base our conclusion only on the information in the record before the ALJ
 The Secretary's supplemental letter could point us to no other evidence of Rose's work as a janitor, but instead argued that Rose had conceded that his past relevant work was as a janitor or had waived this argument on appeal. This contention is discussed infra.
 
 
 [3]
 A fifteen-year limit applies to the consideration of past relevant work: "We consider that your work experience applies when it was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity. We do not usually consider that work you did 15 years or more before the time we are deciding whether you are disabled ... applies." 20 C.F.R. Sec. 404.1565(a). While it is not at all clear from the language of the regulation whether the fifteen-year period runs from the date of the onset of alleged disability, the date of the application for benefits, or the date of the hearing before the ALJ, we will assume for purposes of this appeal that the fifteen year period runs from the date of alleged disability. See Ball v. Secretary of Health and Human Servs., 1990 WL 125357, at * 5, 1991 U.S.App. LEXIS 8578, at * 13 (6th Cir. Apr. 29, 1991) ("[T]he claimant must prove that his disability prevents him from performing any substantial gainful activity that he has carried out within fifteen years prior to the filing of his claim for benefits. 20 C.F.R. Sec. 404.1565(a).")
 
 
 [4]
 "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. Sec. 416.967(c)
 
 
 [5]
 It should be noted that information taken from these checked boxes could be quite misleading. For example, if Rose had had to lift 90 pound wheels every now and then, he would still have had to check the "50 lbs." box, because he never lifted enough to check the "100 lbs." box