Jeffrey NOWLEN, Plaintiff,

v.

**COMMISSIONER OF SOCIAL SECURITY, Defendant.**

No. 01–10210–BC.

United States District Court,
E.D. Michigan,
Northern Division.

July 18, 2003.

Donald T. Popielarz, Smith & Popielarz, Saginaw, MI, for Plaintiff.

Robert W. Haviland, U.S. Attorney's Office, Flint, MI, Vanessa Miree Mays, United States Attorney's Office, Detroit, MI, for Defendant.

*OPINION AND ORDER REJECTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION, GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT IN PART, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND REMANDING TO THE COMMISSIONER FOR FURTHER PROCEEDINGS*

LAWSON, District Judge.

The plaintiff filed the present action on May 17, 2001 seeking review of the Commissioner's decision denying the plaintiff's claim for a period of disability, disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act. The case was referred to United States Magistrate Judge Charles E. Binder by this Court pursuant to 28 U.S.C. § 636(b)(1)(B) and E.D. Mich. LR 72.1(b)(3). Thereafter, the plaintiff filed a motion for summary judgment seeking a reversal of the Commissioner's decision and an immediate award of benefits. Alternatively, the plaintiff requests a remand to the Agency for further proceedings. The defendant filed a motion for summary judgment seeking affirmance of the Commissioner's decision.

Magistrate Judge Binder filed a Report and Recommendation on April 1, 2001, recommending that the plaintiff's motion for summary judgment be denied, the defendant's motion for summary judgment be granted, and the decision of the Commissioner be affirmed. The plaintiff filed timely objections to the Report and Recommendation and this matter is now before the Court. The Court has reviewed the file, the Report and Recommendation and the objections thereto, and has made a *de novo* review of the administrative record in light of the objections filed. The plaintiff's principal objections are that the Magistrate Judge did not properly evalu-

ate the plaintiff's claim that his cervical myelopathy and cervical stenosis met or equaled a medical listing found in Listing 1.05C of the Regulations, and the Administrative Law Judge's contrary finding was not supported by substantial evidence in the whole record; and that the Magistrate Judge committed error in concluding that there was record support for the Administrative Law Judge's determination that the plaintiff's impairment due to depression was not "severe" within the meaning of the Social Security Act and the Regulations. The plaintiff also contends that the Administrative Law Judge did not give proper weight to the opinion of a treating source, as required by the Regulations.

The plaintiff is presently forty-five years old, and filed a claim for a period of disability and disability insurance benefits on February 2, 1999, when he was 41 years old. The plaintiff had worked as a laborer in the refrigerator and air conditioning business, as an assembly line worker, and as a carpenter. His most recent employment was as a road construction worker. His disability claim was based on intractable neck pain, neurological deficits and depression, and he alleged that he became unable to work on August 1, 1998.

The plaintiff's neck pain began in 1991 when he was involved in a motor vehicle accident. In 1992, he underwent a cervical fusion at the C6–7 level, and stated that he never felt completely "normal" in his arms after that time. He complained of numbness, particularly in the left arm, and complications from the surgery required a re-operation approximately one month later. In August 1998, the plaintiff was working on a construction site, and was climbing a ladder when he impacted his head on a beam and lost control of his arms and legs. A coworker was behind him, caught him, and supported his head as he fell. The plaintiff reported that he has been in severe and intractable pain since that time.

The plaintiff's disability claim was initially denied, and the denial was upheld on reconsideration. On June 19, 2000, the plaintiff appeared with counsel and presented his case to Administrative Law Judge (ALJ) William J. Musseman, who denied it in a written decision filed September 19, 2000 in which he concluded that the plaintiff was not disabled. The ALJ reached this conclusion by applying the five-step sequential analysis prescribed by the Secretary in 20 C.F.R. §§ 404.1520, 416.920. The ALJ concluded that the plaintiff had not engaged in substantial gainful activity since August 1998 (step one); the plaintiff suffered from several impairments which he found to be "severe" including cervical spine disorder and myelopathy, but that the plaintiff's depression was not "severe" under the Regulations (step two); none of these impairments by themselves or in combination met or equaled a listing in the Regulations (step three); and the plaintiff could not perform his past relevant work (step four). In applying the fifth step, the ALJ concluded that the plaintiff's complaints of pain were not fully credible, and therefore he retained the residual functional capacity to perform a significant range of sedentary work. The ALJ found that, considering the plaintiff's limitations, there were nonetheless hundreds of jobs in the local and regional economies that the plaintiff could perform.

It is a fundamental principle that the plaintiff bears the burden of proving entitlement to benefits under Title II and Title XVI of the Social Security Act, which means that the plaintiff must establish that he suffers from a disability, as that term is defined in the Act. *See Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir.1994); *see also Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir.1990). "Disability" means:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant suffers from a disability "only if his physical or mental ... impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(1)(B), 1382c(a)(3)(B). The concept of disability, then, relates to functional limitations. Although these functional limitations must, of course, be caused by a physical or mental impairment, in the end, "[i]t is an assessment of what [the claimant] can and cannot do, not what [he] does and does not suffer from." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir.2002) (referring to assessment of residual functional capacity).

■ The standard of review of an ALJ's decision is deferential, and the Commissioner's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). " 'Substantial evidence' means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 535 (6th Cir.1981) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). However, a substantiality of evidence evaluation does not permit a selective reading of the record. "Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record

fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (internal quotes and citations omitted). *See also Laskowski v. Apfel*, 100 F.Supp.2d 474, 482 (E.D.Mich.2000). If the Commissioner's determination is not supported by substantial evidence on the whole record, the administrative decision must be reversed and the case remanded for further action. *See Howard*, 276 F.3d at 242–43.

In his motion for summary judgment, the plaintiff argues that the ALJ should have determined that he met Medical Listing 1.05C, which, at the time, dealt with other vertebrogenic disorders, including spinal stenosis. The Listing stated:

C. Other vertebrogenic disorders (e.g., herniated nucleous pulposus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months. With both 1 and 2:

1. Pain, muscle spasm, and significant limitation of motion in the spine; and

2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.05C (2000).

The Magistrate Judge concluded that there was insufficient evidence in the record to establish that the plaintiff had "significant limitation of motion in the spine," based upon the Magistrate Judge's determination that the plaintiff's treating neurologist, Dr. Carol van der Harst, assessed the plaintiff's rotation in his back as limited only by fifty "percent," head forward flexion to eighty degrees, and lateral flexion between thirty and forty-five degrees. R & R at 19–20. The Magistrate Judge pointed to the decision in *Nunn v. Bowen*, 828 F.2d 1140, 1144–45 (6th Cir.1987), as support for the proposition that such flex-

ion limitations does not satisfy the requirement of Listing 1.05C.

■ In this Circuit, in order to qualify as "disabled" under a Listing in the Secretary's regulations, a claimant must demonstrate that he or she meets *all* of the criteria contained in the Listing. *See Duncan v. Sec'y of Health & Human Servs.,* 801 F.2d 847, 855 (6th Cir.1986).

The portion of the record to which the Magistrate Judge made reference is an evaluation made by Dr. van der Harst at the request of Disability Determination Service in which she assessed the plaintiff's medical limitations in light of the criteria set forth in Listing 1.05C. She concluded that the plaintiff had a vertebrogenic disorder resulting from his cervical stenosis, and that he had pain and a history of muscle spasms. Although she did assess the plaintiff's anterior-posterior movement as eighty degrees of forward flexion and ten degrees of backward extension, she stated that the plaintiff's rotational limitation was fifty *degrees* in total, not fifty *percent.* Normal rotation is one hundred sixty to one hundred eighty degrees, indicating that the plaintiff's spinal rotational limitation was nearly seventy percent.

The Court in *Nunn* did not attempt to quantify the limitation of motion required by Listing 1.05C, and in fact based its decision not only on the limitation of motion exhibited by the plaintiff in that case, but also the lack of sensory loss, also a requirement of the Listing. This Court believes that a rotational limitation of the extent reported by Dr. van der Harst, which is uncontradicted in this record, is sufficient to satisfy the requirement of Listing 1.05C(1). Dr. van der Harst did not find that the plaintiff had appropriate *radicular* distribution of significant motor loss, muscle weakness or sensory loss, but that he nonetheless suffered those deficits as a result of spinal cord syndrome. Although this condition did not meet the requirement of paragraph 2 of the Listing, the plaintiff claims that this requirement can be satisfied through a Listing 11.04B, which states:

Significant and persistent disorganization of motor function in two extremities, resulting in sustained distribution of gross and dexterous movements, or gait and station.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.04B. There is a reference to Listing 11.00(C), which defines the terminology as follows:

*Persistent disorganization of motor function* in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combination, frequently provides sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with the locomotion and/or interference with the use of fingers, hands, and arms.

Accordingly, plaintiff argues, essentially, that the neurological manifestation of his spinal stenosis can satisfy the second part of Listing 1.05C through medical equivalence. The Regulations state:

We will decide that your impairment(s) is medically equivalent to a listed impairment (appendix 1) if the medical findings are least equal in severity and duration to the listed findings. We will compare the symptoms, signs, and laboratory findings by your impairment(s), as shown in the medical evidence we have about your claim, with the medical criteria shown on the listed impairment.

20 C.F.R. § 404.1526.

The plaintiff's medical history in this record begins in September 1998. When

plaintiff was seen by his family doctors, F.C. Stevens, DO and Laurence Yong, DO, with complaints of frontal headaches, dizziness, nausea and weight loss, in addition to left shoulder and neck pain. On examination, he was found to have loss of motion in the cervical spine and the left shoulder, and he was sent for a cardiac work-up because of complaints of chest pain. The cardiac work-up ultimately proved to be normal.

He was next seen by Dr. Yong on October 1, 1998 complaining of chronic frontal headaches that had been getting worse over the past two to three months. He reported that pain medication, including narcotics, were not effective to break the pain cycle. He was fatigued and complained of feeling depressed. The plaintiff continued to complain of intractable headache and neck pain at an examination of November 13, 1998. He also was having numbness and tingling in both arms, although he denied any loss of strength in his upper extremities. He had diminished reflexes, and paresthesia in the lower cervical distributions including numbness and tingling in both arms, but worse on the left side. Dr. Yong prescribed a nerve block at a pain clinic, and noted that the plaintiff's "[p]rognosis . . . is guarded to poor, as any tests that are done may show worsening disease, but whether surgical intervention is going to be an option or not, is questionable." Tr. at 154. A progress note on December 14, 1998 indicates that Dr. Yong referred the plaintiff to Dr. van der Harst, whom he saw on December 21, 1998. Imaging studies showed spinal compromise, with x-rays indicating advanced degenerative changes and an MRI revealing spinal stenosis with spinal cord compression and a "significant disc protrusion/herniation" at multiple cervical levels. Tr. at 136–37, 267.

On January 6, 1999, the plaintiff underwent a nerve block procedure and trigger point injection for his neck and headache pain. His lumbar posture was fair at that time, but it was difficult to obtain reflexes in the upper extremities. Approximately two weeks later, on January 19, 1999, Dr. van der Harst reported that the plaintiff complained of deep aching neck pain and headaches that could not be relieved by anything but a neck brace and lying down. He was having difficulty with sleep, and with turning his neck. He was still depressed, and Dr. van der Harst prescribed medications for both pain and depression.

On February 2, 1999, Dr. van der Harst referred the plaintiff to Dr. Steven Papadopoulos, a neurosurgeon in Ann Arbor, Michigan. The next day she reported to Dr. Yong that imaging studies showed severe stenosis due to degenerative disc disease at multiple cervical levels, and boney changes causing thecal sac compression. She stated that the plaintiff was disabled because of his severe cervical spine abnormalities, but noted that "[r]ehabilitation to light employment maybe feasible in the future once cervical disease and pain problems have stabilized, but this estimated to require greater than one year from the time he last worked." Tr. at 255. The plaintiff continued to see Dr. van der Harst while he consulted with the neurosurgeon, Dr. Papadopoulos. On March 11, 1999, Dr. van der Harst reported that the plaintiff's depression was somewhat improved on Zoloft, and that his neck pain was controlled on OxyContin, although the medication caused stomach distress. He still suffered from upper extremity weakness.

By May 12, 1999, the plaintiff was complaining of progressive weakness, balance problems and clumsiness. The records indicate that his pain and depression were still controlled by medication, but that his quadriparesis was progressing and that he was permanently disabled from his previ-

ous work, although his cervical range of motion had improved. Dr. Papadopoulos performed a cervical spinal cord decompressive laminectomy at the C3–4 level on March 27, 1999. The plaintiff was discharged from the hospital two days later and cleared for physical therapy.

After reviewing the medical records, the Court believes that the plaintiff suffered some short term relief following the surgery, but that his gains were short-lived, and that his condition progressively deteriorated over time thereafter. A few weeks after the surgery, on June 10, 1999, Dr. van der Harst reported that the plaintiff still had pronounced numbness, balance problems and clumsiness after the surgery, but those conditions were somewhat improving. His neck pain and depression were improving, but he was still taking Zoloft and OxyContin. This quadriparesis had progressed with post operative edema, and he required a splint to prevent contracture of his right hand, although Dr. van der Harst noted that the plaintiff had not yet reached maximum medical improvement at that time.

On July 9, 1999, the plaintiff reported to Dr. van der Harst that he was still feeling numbness down his right arm and that he was weak and numb from the chest down. He was having balance problems and difficulty walking. On examination, Dr. van der Harst noted that the plaintiff was still spastic, stood with difficulty, and ambulated with stiffness, although his loss of balance was mild. His strength had improved and his right hand did not exhibit any clawing. Dr. van der Harst also noted that the plaintiff was still in pain, but that his prognosis for additional improvement was good. By August 2, 1999, the plaintiff was not able to write due to the numbness in his hands. He reported that he had been falling a lot, although he had not injured himself as a result. He was experiencing difficulty with sleep, and the pain

medication, he believed, was affecting his cognitive ability. He reported that he believed physical therapy was helping him get his strength back, but he continued to loose weight. His gait was mildly spastic, his right leg was stiff, and he had generalized muscle atrophy. Dr. van der Harst stated that the plaintiff was still totally disabled from his previous work, and noted that he was meeting with Michigan Rehabilitative Services for occupational and vocational redirection therapies.

On September 2, 1999, the plaintiff was still reporting balance problems and that he was still falling when he tried to ambulate. Sleep was still a problem, and the plaintiff described himself "at the end of his rope" because he was turned down for disability and he had no employment possibilities. He had band-like sensations across his chest and vibratory sensations in his body, he could not control his legs, and he had no sexual function. The pain persisted in his neck, left shoulder, and arm. He continued to loose weight. His gait was mildly spastic, and he suffered from balance impairment and sensory dysfunction to his bipedal gait. He had a pen writing device that fit his palm, but he still had generalized muscle atrophy. Dr. van der Harst opined that the plaintiff was not physically capable of performing his previous work, and that "[t]otal disability continues to be recommended. The patient's rehabilitation potential will require extensive re-education because of his experience in heavy manual labor, and is expected to require three to four years of retraining for successful job re-entry at a sedentary professional level of employment, compatible with his severe musculoskeletal neurological and psychological disabilities." Tr. at 227.

On November 9, 1999, almost six months after the surgery, the plaintiff continued to have numbness in his arms and difficulty

with grasping and releasing in his right hand. He was still depressed, although his overall pain had improved, and he was having difficulty walking. He was slow to bend and unable to squat, and moving from a chair to a standing position was impaired. He still suffered shoulder and neck pain, he was still spastic in his extremities, his myelopathy was ongoing, and he was still depressed. He continued to work toward improvement through physical therapy. Dr. van der Harst reports that on December 14, 1999, the plaintiff's weight was significantly lower than the previous month, he ambulated with a spastic myeleopathic pattern, but had no loss of balance. However, he suffered weakness and clumsiness throughout his ambulation. His neck pain had improved, his depression had improved, and she reported that his myelopathy had stabilized. However, on March 21, 2000, the plaintiff was still falling while walking, although he was "doing fairly well in functioning at home," but his muscles were tighter and more painful, and he slept with difficulty. His weight had rebounded somewhat, but he stood slowly and was still spastic on his right side, greater than his left. He had clawing of his right hand, his gait was stiff, and he was clumsy and slow. Dr. van der Harst reported that his "[f]unctional capacity— severely restricted in material handling and ambulation. He should be able to retrain in lighter employment over the next couple of years as he works with Michigan Rehab. Total disability from previous employment is an ongoing source of financial hardship at this time." Tr. at 293.

As mentioned earlier, the ALJ found that the plaintiff's severe impairments did not meet or equal a medical listing, but the Court believes that the administrative record does not support this conclusion. The ALJ did not deal with this issue in any detail and so the Court is unable to determine whether the ALJ re-jected the plaintiff's treating source's opinion of significant limitation of the plaintiff's rotational spinal movement, as the Magistrate Judge did in error, or whether the ALJ viewed Dr. van der Harst's opinion on the second element of Listing 1.05C was conclusive on the point, without dealing with the concept of medical equivalence through Listing 11.04B, which the record clearly supports. Although there is substantial evidence on both of these points in the record, the determination is for the ALJ to make in the first instance.

In addition, the plaintiff sought treatment for his depression and was evaluated by the Michigan Disability Determination Service physician on April 19, 1999. A psychologist, Dr. Ann Date, diagnosed the plaintiff with major depression that had, by history, lasted for the previous eight months. He had a lack of interest, he withdrew socially, he felt hopeless, and had suicidal thoughts. He also had feelings of anger and had a difficult time coping with his current circumstances, and he lacked motivation to get out of bed and do much during the day. Tr. at 172–75. She assessed his Global Assessment of Functioning (GAF) at 45.

The plaintiff treated with Dr. Barry Binkley at Tuscola Behavior Health Systems, and with a psychologist at List Psychological Services. A September 17, 1999 psychological evaluation reports that the plaintiff suffered from chronic depression with suicidal ideation, anxiety and insomnia. It was hard for him to relax and function, and he was extremely tense and angry. Tr. at 283. He reported the events of his physical disability to Dr. Binkley, and describing his most recent surgery indicated that there was a "slight accident during the operation which left him sensory deprived from the chest down including both arms and all the way down and he can just barely feel anything." Tr.

at 283. Dr. Binkley diagnosed a dysthymic disorder and assessed the plaintiff's GAF at 35. A List Psychological Services' evaluation one day earlier noted that the plaintiff was diagnosed with depression and exhibited a depressed mood, sleeplessness, tearfulness, and suicidal ideation, and loss of interest and motivation for activities. However, the evaluator assessed the plaintiff's GAF at 52.

The GAF scale is reflected in Axis V of a differential diagnosis. "Axis V is for reporting the clinician's judgment of the individual's overall level of functioning. This information is useful in planning treatment and measuring its impact, and in predicting outcome. The reporting of overall [psychological, social, and occupational] functioning of Axis V is done using the Global Assessment of Functioning (GAF) Scale." *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM–IV)*, 30 (4th ed.1994). A GAF Scale of 71 to 80 indicates no more than slight impairment in areas such as social or occupational functioning; a scale of 70 to 61 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, and has some meaningful interpersonal relationships; a scale of 51–60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with co-workers); a scale of 41–50 indicates serious symptoms e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting, or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job); a scale of 31–40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).

■ The ALJ concluded that the plaintiff had no severe mental impairment because there was no evidence that the plaintiff's depression had any effect on is ability to work. However, the evidence clearly indicates that the plaintiff was a construction worker who could no longer do any heavy work, and was required to engage extensive occupational therapy over a multi-year period, according to Dr. van der Harst, due to the plaintiff's functional limitations before he would be able even to perform sedentary work. The loss of interest in motivation for activities coupled with anxiety, suicidal ideation and the disinclination to get out of bed and leave the house as a result of the plaintiff's major depression undoubtedly had a direct effect on the plaintiff's rehabilitative mission, and provided objective proof supporting the plaintiff's testimony at the administrative hearing. The plaintiff's GAF indicated moderate to serious symptoms, including some impairment in reality testing or communication. Nevertheless, the defendant asserts that substantial evidence supports the ALJ's conclusion that the plaintiff failed to carry his step-two burden, which has been characterized in this circuit as "*de minimis.*" *See Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir.1988); *Murphy v. Secretary of Health and Human Services,* 801 F.2d 182, 185 (6th Cir.1986). In *Salmi v. Secretary of Health and Human Services,* 774 F.2d 685 (6th Cir.1985), the Court of Appeals held that an impairment qualifies as "non-severe" only if it "would not affect the claimant's ability to work," regardless of the claimant's age, education,

or prior work experience. *Id.* at 691–92. The prevailing view, then, is that only slight abnormalities that minimally affect a claimant's ability to work can be considered non-severe. *Higgs v. Bowen,* 880 F.2d 860, 862 (6th Cir.1988); *Farris v. Sec'y of Health and Human Servs.,* 773 F.2d 85, 90 (6th Cir.1985). The Court believes that substantial evidence did not support the ALJ's conclusion that the plaintiff's depression was not "severe" within the meaning of the Regulations.

 That leaves the question whether further fact-finding is required, for "[i]f a court determines that substantial evidence does not support the Secretary's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health and Human Servs.,* 17 F.3d 171, 176 (6th Cir.1994). The Court believes that further factfinding is required because, although there is substantial evidence in the record supporting the plaintiff's argument that his impairments equal a Listing in the regulations, the ALJ must make this determination in the first instance since proof of disability is not "overwhelming." *See Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir.1985). In addition, the ALJ failed to find that the plaintiff's depressive disorder was "severe," a decision that is clearly erroneous, but nonetheless precluded further evaluation of that impairment and its effect on the plaintiff's residual functional capacity to work. The ALJ must decide these factual issues as well.

Accordingly, it is **ORDERED** that the Magistrate Judge's Report and Recommendation is **REJECTED.**

It is further **ORDERED** that the plaintiff's motion for summary judgment [dkt # 10] is **GRANTED IN PART** and **DENIED IN PART.**

It is further **ORDERED** that the defendant's motion for summary judgment [dkt # 15] is **DENIED.**

It is further **ORDERED** that the findings of the Commissioner are **REVERSED,** and the matter is **REMANDED** to the Social Security Commission for further proceedings as directed herein.